UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| ) | |
| vs. ) | Case No. 1:22-CR-00323 |
| ) | |
| RAHEIM HAMILTON, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT RAHEIM HAMILTON'S MOTION FOR PRETRIAL RELEASE**

Defendant Raheim Hamilton ("Hamilton") or ("Mr. Hamilton"), by and through his undersigned counsel, respectfully moves this Court for an order granting him pretrial release on conditions under 18 U.S.C. § 3142(a)(2).

Mr. Hamilton was arrested in the Eastern District of Virginia about a month ago pursuant to a warrant issued with the indictment in this case. Following an interview with Pretrial Services in that District, during which defense counsel was not present, Pretrial Services recommended Mr. Hamilton's release on a modest unsecured bond under pretrial services supervision and to a custodian (his sister) with standard conditions. But after a detention hearing in that District, the Magistrate Judge ordered Mr. Hamilton detained as a serious flight risk based on a series of proffers and arguments made by the government that were not disclosed to Mr. Hamilton before the hearing, and which Mr. Hamilton had no opportunity to discuss with his counsel and meaningfully refute during the hearing.

The government's proffers were inaccurate in several material respects. Additionally, the government asked the Court to draw inferences that were not appropriate due to material facts Mr. Hamilton could not discuss with his counsel and present to the Court during the previous hearing.

1

This motion addresses both those concerns. For the reasons discussed further below, ultimately, the government cannot meet its burden of establishing no condition or combination of conditions will reasonably assure the appearance of Mr. Hamilton. He should therefore be released on conditions before trial.

I. **FACTUAL/PROCEDURAL BACKGROUND**

Mr. Hamilton is charged by indictment with a single count under 18 U.S.C. § 371 of conspiracy to sell, transfer, and deliver false, forged, counterfeited, and altered obligations and securities of the United States, with the intent that the same be passed, published, and used as true and genuine in violation of 18 U.S.C. § 473. Mr. Hamilton is one of two defendants charged in the indictment. The other defendant is Thomas Pavey ("Pavey'). In sum, the indictment alleges that Mr. Pavey created counterfeit currency for sale in an online marketplace called AlphaBay, which the government describes as part of the "dark web," while Mr. Hamilton served as a middleman selling the currency that Pavey manufactured to customers on AlphaBay. The indictment does not allege that Mr. Hamilton had any role in creating the alleged counterfeit currency.

Mr. Hamilton's Rule 5 initial appearance occurred in the Eastern District of Virginia on December 21, 2022. Mr. Hamilton was interviewed by Pretrial Services in that District. Their report recommended that Mr. Hamilton be released on a modest ($25,000) unsecured bond, have his sister serve as a custodian, and submit to pretrial services supervision with standard pretrial release conditions. Defense counsel was not present during the Pretrial Services interview with Mr. Hamilton.

A detention hearing was held in that District on December 23, 2022.[1] The government sought detention solely on the basis that Mr. Hamilton is a serious flight risk. It did not argue that any presumption in favor of detention applied or that Mr. Hamilton posed a danger to the community.

In sum, the government's proffer and argument that Mr. Hamilton is a serious flight risk boiled down to three basic subjects (i) his international ties and travel history; (ii) his assets; and (iii) the nature of his alleged crime and his statements during the Pretrial Services interview. Notably, the government's proffer was riddled with hedging language and failure to identify the basis of the government's "beliefs,"[2] which as explained below reveals that many of the "facts" proffered by the government were not facts at all but unfair inferences and errors.

The government's proffered facts were not shared with defense counsel prior to the detention hearing, and Mr. Hamilton was unable to meaningfully confer with counsel during the hearing to address the details underlying the numerous inaccuracies in the government's proffer. Nevertheless, Mr. Hamilton presented one witness, his sister and proposed custodian Danielle Hamilton, a former police officer nearing the final stages of employment with another law enforcement agency. Ms. Hamilton confirmed that Mr. Hamilton could live in the family home in Suffolk and that she understood the responsibilities of a custodian and was ready to assume them.

The Court in the Eastern District of Virginia ordered that Mr. Hamilton be detained. The detention order cited Mr. Hamilton's ties to Trinidad and Tobago (including a recent one-way

---

[1] The government emailed to the Court a copy of the transcript of that hearing to consider in connection with Mr. Hamilton's motion.

[2] *E.g.*, Hr'g Tr. at 6:5-6 ("*The government believes* he owns property overseas."); Hr'g Tr. at 7:13-15 ("*[T]here's a belief* that Mr. Hamilton would still have access to a potentially large amount of cryptocurrency."); Hr'g Tr. at 7:18-19 ("[T]here are also receipts for *what appears to be* a Vietnamese bank account . . . "); Hr'g Tr. at 8:22-24 ("*There are also suggestion* [sic] that a good amount of money was moved . . .") (all emphases added).

ticket purchase); "extensive" assets in cybercurrency the Court stated was not disclosed to Probation, including recent transfers; gold and cash assets seized during execution of a search warrant; "unreported international travel" and evidence of a Vietnamese bank account; lack of stable employment; and the proposed custodian's testimony that she was between law enforcement jobs because she was "contemplating going home to Trinidad for a while."[3]

## II. ARGUMENT

### A. Legal Standard

The Bail Reform Act provides that a detention hearing may be "reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of hearing and that has a material bearing on the issue [of detention]." 18 U.S.C. § 3142(f).

### B. Mr. Hamilton Is Not a Serious Flight Risk.

Mr. Hamilton is a citizen of the United States[4] and has lived in the Norfolk area of Virginia for approximately sixteen years, *i.e.*, since the age of ten. He has extensive and longstanding family ties in that area. This includes his entire nuclear family consisting of his mother, father, and two sisters, plus extended family including an uncle's family and a cousin.

Mr. Hamilton's ties with his family are close. His mother, who drove from Virginia to be present at Mr. Hamilton's arraignment in the Northern District of Illinois despite knowing she would likely be unable to communicate with him, operates a power washing business that Mr.

---

[3] Ms. Hamilton testified that she left her old police department on good terms, had a good recommendation from her old department, was nearing the end of completing her application process to a new agency, and that in the interim between she was planning to "head home for a while *and come back*." Hr'g Tr. at 14:10-11 (emphasis added).

[4] Mr. Hamilton, as well as both of his parents, are dual citizens of both the United States and Trinidad and Tobago.

4

Hamilton assists with from time to time. As noted, his sister has a career in law enforcement and has volunteered to serve in the role of custodian. Both Mr. Hamilton's mother and sister plan on being present for his detention hearing.

Mr. Hamilton has also invested in real estate in the Norfolk area. He owns a self-managed triplex investment property. Currently, only one of the three units is occupied by a renter, in part because Mr. Hamilton was in the process of locating additional tenants when he was arrested, and he has been unable to coordinate the process effectively while in custody. Mr. Hamilton also owns the property in Suffolk where his mother and two sisters reside.[5]

Mr. Hamilton has been interested in digital currencies since he was a teenager and began following the market in its nascent stages. As an early-adopter in that day-trading space, Mr. Hamilton was able to turn a hobby into profits. For example, in 2014, when Mr. Hamilton was day-trading digital currencies as an 18-year old, the value of Bitcoin fluctuated between approximately the mid-$300's and about $770 per Bitcoin. As of the date of this filing, one Bitcoin sells for approximately $23,000. Mr. Hamilton has been day-trading digital currencies his entire adult life.

C. **The Government's Previously Proffered Facts and Argument Are Not Persuasive.**

Taking a step back, the government's previous proffer suffers from three major flaws. First, it amounts of a hodge-podge of facts that fail to paint a cogent narrative of how and why Mr. Hamilton would actually flee. For example, the government has made extensive efforts to emphasize Mr. Hamilton's ties to Trinidad and Tobago, apparently suggesting he may flee there.

---

[5] The triplex Mr. Hamilton purchased not long ago for approximately $527,000, and there is no mortgage on the property. The family-occupied residence was purchased for approximately $460,000 with a 20% down payment and a mortgage.

But Trinidad and Tobago has an extradition treaty with the United States,[6] so that scenario makes no sense. Second, many of the facts are simply wrong. Third, the government was either unaware of or omitted numerous facts that undermine any inference that Mr. Hamilton poses a serious flight risk.

1. Mr. Hamilton's International Ties

Mr. Hamilton has regularly taken trips to Trinidad and Tobago, where he was born and where his grandparents live. More importantly, after visiting family, he always returns home to live in Virginia where he has lived for sixteen years. The government argued repeatedly that Mr. Hamilton's recent purchase of a one-way ticket to Trinidad and Tobago was suspicious. This is both misleading and confusing. It is misleading because Mr. Hamilton has family in Trinidad and Tobago he can stay with, and he has a documented history of *frequently* purchasing one-way tickets to that country when he knows he wants to visit but is flexible on a specific return date. The point is – he always comes back despite purchasing a one-way ticket. It is unclear if the government knew about this history of one-way travel purchases, or if it failed to adequately investigate it before seeking Mr. Hamilton's detention on this ground.

The government's one-way ticket argument is also confusing because if the government believes this was really a ticket for Mr. Hamilton to leave the country and never come back, it has proffered nothing resembling a coherent narrative as to why he would choose to abandon his home of sixteen years, his entire nuclear family, and his relatively-recent real estate purchases and investments all of the sudden – and before he was aware of the government's investigation. In contrast to this tenuous theory, reality is fairly banal. Mr. Hamilton's family was booked to

---

[6] *See* https://www.state.gov/u-s-relations-with-trinidad-and-tobago/; https://www.congress.gov/105/cdoc/tdoc21/CDOC-105tdoc21.pdf.

travel to Trinidad and Tobago for the Christmas holiday to celebrate with his grandparents. The government's efforts to twist that booking into something suspicious fall far short.

The government's suggestion that Mr. Hamilton has an "extensive international travel history" besides Trinidad and Tobago is wrong. Mr. Hamilton has traveled to one other country besides Trinidad and Tobago: Vietnam. He has traveled to Vietnam a few times because that is where his girlfriend – who he met when he was 17 years old and has been with ever since and to this day – lives. The government proffered that Mr. Hamilton has also traveled to Hong Kong, Japan, and Korea. In fact, however, those are all layovers Mr. Hamilton had while traveling to and from Vietnam. He never left the airport in those countries nor traveled there other than while in transit to and from Vietnam. Again, it is unclear if the government knew this or simply failed to investigate adequately before seeking to keep Mr. Hamilton in custody by overstating his international travel, when in reality he has just visited his family and girlfriend in two different countries.

2. Mr. Hamilton's Assets

The government suggests Mr. Hamilton is a serious flight risk because his assets include digital currencies. But the possession of assets neither enables anyone to travel without a passport, nor serves as an incentive by itself to flee. Because the government fails at the threshold steps to proffer facts (i) that Mr. Hamilton actually *would* flee prosecution despite his close and extensive ties to the community – which would involve forfeiting any bond, subjecting his sister to negative consequences as his custodian, and forever abandoning his nuclear family he is demonstrably close with – and (ii) that with access to money he has the wherewithal to leave the United States without a passport, it is simply immaterial that Mr. Hamilton, like countless defendants released on bond, has assets that could be spent on travel.

7

The government also proffered facts about other assets found in Mr. Hamilton's possession during execution of a search warrant. Specifically, the government proffered that it seized approximately $200,000 worth of gold and silver, plus approximately $100,000 in cash, in addition to locating receipts "for what appears to be a Vietnamese bank account" containing the equivalent of approximately $500 U.S. dollars in Vietnamese currency. As discussed above, Mr. Hamilton has been an amateur investor for some time. Mr. Hamilton's decision to spread his investments and assets across a range of risk profiles, from conservative (*i.e.*, real estate), to moderate (*i.e.*, precious metals), to volatile with extreme upside (*i.e.,* digital currency), while maintaining a cash reserve in very uncertain global market conditions, makes his financial portfolio diverse – but it does not make him a serious flight risk. To the extent the government is hinting that these types of assets are associated with illegal activity, hints are insufficient and the government needs to support that argument with a more specific proffer, particularly where the issue before the Court is not Mr. Hamilton's guilt or innocence regarding charged or uncharged conduct, but whether he is a serious flight risk. *E.g.*, *United States v. Radick*, No. 05 CR 798-2, 2006 WL 436116, at *3 (N.D. Ill. Feb. 17, 2006) ("The charge, at this stage, is an accusation. The weight of the evidence against him is the "least important of the various factors." (internal citation omitted)).

The government's effort to link Mr. Hamilton to other foreign assets – specifically a Vietnamese bank account and unidentified "property overseas" – falls short. Regarding the bank account, the prosecutor described what receipts (that the government has not shown Mr. Hamilton) seized by the government "appear[] to show." Mr. Hamilton, however, need not hedge – he does not have and has never had a Vietnamese bank account. The receipts likely either show the value of a withdrawal from a U.S. bank account while Mr. Hamilton was visiting his girlfriend in Vietnam, or receipts from a withdrawal from his girlfriend's bank account that Mr. Hamilton only

8

had temporary access to while visiting her and was never a signatory on. Mr. Hamilton can only speculate, because the government has not shown him the specific receipts it is referencing – but he knows he does not have and has never had a Vietnamese bank account.

Similarly, the government's vague reference to "property overseas" conjures images of residences in multiple countries to which Mr. Hamilton could flee – but the reality is far more mundane. Mr. Hamilton is only on title to a single property outside of the United States: he is the one-third owner of a family home occupied by his grandmother and other family in Trinidad and Tobago. While he has explored purchasing additional property in Trinidad and Tobago as investments, those transactions were never finalized.

The government's final proffer about Mr. Hamilton's assets at the detention hearing in the Eastern District of Virginia was a highly misguided effort to cast suspicion on a series of digital currency transactions around August 2022. The government mischaracterized these transactions as involving "a good amount of money [being] moved out of this country since August of 2022." Hr'g Tr. at 8:22-24. Undersigned counsel acknowledges that the technical details of digital currency blockchain technology can be complex, but a few basic facts are indisputable, particularly that the digital currency native to the Ethereum network is not "located" in any particular country.[7] As a result, assuming the government is correct that these transactions involved Mr. Hamilton, they did not involve moving any assets "outside" of the United States. Rather, once again the facts are far less dramatic than the government's portrayal. As noted above, Mr. Hamilton trades digital currencies. The August 2022 transactions the government describes – assuming the government

---

[7] Indeed, the indictment in this case alleges that "[v]irtual currencies are . . . generated and controlled through computer software operating on decentralized peer-to-peer networks." ¶ 1(e).

9

is correct that they involved Mr. Hamilton – are consistent with a digital currency trade, not anything inherently suspicious or indicative of a serious flight risk.

### 3. Mr. Hamilton's Alleged Crime and Statements to Probation

The government's remaining set of proffers and arguments misstate and overstate Mr. Hamilton's alleged role in the charged crimes and his conduct since being arrested. The government first argues that the nature of the alleged crime purportedly involves "substantial awareness of how to create money illicitly" – but the actual indictment says the opposite, alleging that Mr. Hamilton's co-defendant was the individual responsible for creating the counterfeit currency, and that Mr. Hamilton allegedly served in the role of middle-man salesman connecting the co-defendant with customers. The government also seeks to fault Mr. Hamilton for not telling Probation about the assets that were seized during the government's search of his residence, but Mr. Hamilton was not represented by counsel during the interview, it is unclear how the question to him was phrased, and without clarification and counsel many lay people consider assets seized by the government that they can no longer access not to be their assets any more.

The remaining hodge podge of proffers made by the government bear hardly at all on the issue of whether Mr. Hamilton poses a serious flight risk. The government proffered that over six years ago a username the government associates with Mr. Hamilton posted in an AlphaBay forum about a desire to make money through fraud. But even if those were Mr. Hamilton's statements, and regardless of whether he followed through on them, he remained living in Virginia ever since while developing and strengthening local ties that keep him rooted to that community. In addition, the government proffered evidence of an apparently fake Florida driver's license with Mr. Hamilton's likeness on it, but the government proffered no facts or theory that Mr. Hamilton had ever used the license or the name associated with the license. Finally, the government pointed out

that Mr. Hamilton was on unsupervised probation for a misdemeanor petty theft conviction (which is his only prior conviction) during the period the government alleges he committed the crimes in the indictment. But being accused (and not yet proven) to have engaged in illegal conduct while on unsupervised misdemeanor state probation cannot be used a proxy for how an individual subject to supervised federal pretrial release, monitored by a custodian with a law enforcement background, and subject to whatever bond or other conditions the Court deems appropriate here, would behave.

## **CONCLUSION**

Therefore, for the reasons set forth above, the Court should release Mr. Hamilton to the supervision of Pretrial Services with his sister Danielle Hamilton acting as custodian, plus standard pretrial conditions proposed by Pretrial Services. Though not necessary, additional conditions including location monitoring and/or a bond secured by the real property he owns in Virginia would certainly be sufficient to ensure his appearance at future proceedings.

Respectfully submitted,

*/s/William J. Edelman*
WILLIAM J. EDELMAN

*Attorney for Raheim Hamilton*

Delahunty & Edelman LLP
200 E. Randolph St.
Suite 5100
Chicago, IL 60601
Ph: (312) 820-2501
Fax: (415) 891-6256
Email: wedelman@delawllp.com

## **CERTIFICATE OF SERVICE**

The undersigned states that, on January 24, 2023, he caused the above to be served on counsel of record by way of ECF filing.

>Respectfully submitted,
>
>*/s/ William J. Edelman*
>WILLIAM J. EDELMAN
>
>*Attorney for Raheim Hamilton*