```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF VIRGINIA
 2                          Norfolk Division

 3

 4  - - - - - - - - - - - - - - - - - -
                                       )
 5    UNITED STATES OF AMERICA         )
                                       )
 6    v.                               )    CRIMINAL ACTION NO.
                                       )          2:22mj280
 7    RAHEIM HAMILTON,                 )
                                       )
 8          Defendant.                 )
                                       )
 9  - - - - - - - - - - - - - - - - - -

10

11

12                    TRANSCRIPT OF PROCEEDINGS
                          (Detention Hearing)

13                        Norfolk, Virginia

14                        December 23, 2022

15

16  BEFORE:  THE HONORABLE DOUGLAS E. MILLER
            United States Magistrate Judge

17


18

19  APPEARANCES:

20          UNITED STATES ATTORNEY'S OFFICE
            By:  Anthony Mozzi
21              Assistant United States Attorney
                Counsel for the United States

22          BUSH & TAYLOR PC
            By:  Julian D. Bouchard
23                    - and -
            RICHARD B. CAMPBELL, PLC
24          By:  Richard B. Campbell
                Counsel for the Defendant

25
```

2

```
1                        I N D E X

2

3   DEFENDANT'S
    WITNESSES                                        PAGE
4
     DANIELLE HAMILTON
5        Direct Examination By Mr. Bouchard          13
         Cross-Examination By Mr. Mozzi              17
6

7

8                      E X H I B I T S

9                       (None offered)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                (Proceedings commenced at 11:58 a.m.)
2                THE CLERK:  United States of America vs. Raheim
3      Hamilton, 2:22mj280.
4                Is the government ready, Mr. Mozzi?
5                MR. MOZZI:  The government is ready.  Good
6      afternoon, Your Honor.
7                THE COURT:  Good afternoon, Mr. Mozzi.
8                THE CLERK:  Is the defendant ready, Mr. Bouchard and
9      Mr. Campbell?
10               MR. BOUCHARD:  The defendant is ready.  Good
11     afternoon, Your Honor.
12               THE COURT:  Good afternoon, Mr. Bouchard.
13               And good afternoon, Mr. Campbell.
14               MR. CAMPBELL:  Good afternoon, Your Honor.
15               THE COURT:  I did get a copy of a pro hac vice
16     request for admission on behalf of Mr. Campbell, and it all
17     appears to be in order.  So I'm going to grant the request to
18     admit Mr. Campbell pro hac vice for purposes of this case.
19               I note that you are a Virginia-admitted attorney,
20     Mr. Campbell.
21               MR. CAMPBELL:  Yes, Your Honor.
22               THE COURT:  You are also admitted in the Eastern
23     District of North Carolina, I believe?
24               MR. CAMPBELL:  Yes.  I'm licensed in North Carolina
25     as well, since 2015.
```

```
 1              THE COURT:  The only thing I wanted to clarify is

 2    that, of course, you probably could be admitted as a regular

 3    member of the Bar of this court, but being admitted pro hac

 4    will require that you keep Mr. Bouchard or another local

 5    counsel with you while you're practicing.

 6              MR. CAMPBELL:  I'd prefer to be registered, but I

 7    think -- is that a different application?

 8              THE COURT:  It is a different application.  It's a

 9    different process.  You'll have to get two attorneys.  It's

10    not something you can accomplish today.  But the point I

11    wanted to make was that this application will only admit you

12    pro hac vice.

13              MR. CAMPBELL:  Yes, Your Honor.

14              THE COURT:  If you do want to be admitted as a

15    member of the bar, you can go through that, and that would

16    change your status, and you could appear without local

17    counsel, but for now, you'll have to have local counsel with

18    you.

19              MR. CAMPBELL:  Yes, Your Honor.  Thank you.

20              THE COURT:  Okay.  So Mr. Campbell is now admitted

21    pro hac.

22              Mr. Hamilton is present.  I understand we're here

23    for detention proceedings.  Did both counsel -- did all

24    counsel receive a copy of the bond report?

25              MR. BOUCHARD:  Yes, Your Honor.
```

```
1              MR. MOZZI:  Yes, Your Honor.
2              THE COURT:  And is the United States still seeking
3    Mr. Hamilton's detention?
4              MR. MOZZI:  Yes, Your Honor.
5              THE COURT:  All right.  And we're going forward with
6    the hearing today, Mr. Bouchard and Mr. Campbell?
7              MR. BOUCHARD:  Yes, if it please the Court.
8              THE COURT:  All right.  Mr. Mozzi, are you going to
9    proceed by proffer or call a witness?
10             MR. MOZZI:  Proceed by proffer, Your Honor.  I have
11   one exhibit that I showed to my colleagues, and I understand
12   there are no objections with that.
13             THE COURT:  Okay.
14             MR. BOUCHARD:  That is correct, Your Honor.  And no
15   objection to the proffer.
16             MR. MOZZI:  Your Honor, I've had the privilege of
17   speaking with Special Agent Timothy Mallick of the Chicago
18   Field Office as well as a Deputy Chief Melody Wells within
19   the United States Attorney's Office for the Northern District
20   of Illinois about this case.
21             The government's position is that the defendant is a
22   serious flight risk and that no condition or combination of
23   conditions will reasonably assure his appearance in court as
24   required.
25             There are several reasons here.  Specifically, Your
```

1    Honor, Mr. Hamilton was booked on a one-way ticket to

2    Trinidad on December 22nd, shortly before the search warrant

3    was executed.  He has significant foreign ties, especially to

4    the country of Trinidad.

5         The government believes he owns property overseas,

6    in that country.  He has an extensive international travel

7    history, including multiple trips back to and from Trinidad

8    as well as other countries, and he has access to substantial

9    cryptocurrency holdings, which by their nature are accessible

10   worldwide and easily concealed.

11        Your Honor, I would like to start first with the

12   indicted offense here.  The indictment alleges that

13   Mr. Hamilton was involved in a large-scale counterfeiting

14   currency conspiracy using the dark web.  That offense itself,

15   the government submits, goes to his risk of flight.

16        This is not an offense of theft in the physical

17   world but rather indicates substantial awareness of how to

18   create money illicitly and access to funds through the

19   internet in a way that is concealed.

20        Though not alleged in the indictment, the government

21   has evidence that Hamilton using the Zero Angel account wrote

22   on AlphaBay on or about May 25th of 2016, and I quote, "I'm

23   trying to get involved into the fraud realm is because I

24   don't want to spend 40-plus years of my life working a

25   9:00-to-5:00 job, and I'm hoping I'm worth a million bucks by

1    the time I turn 65 and retire."

2         Defendant later continued:  "My plan was to rack up

3    500,000 to $750,000 in two to three years, launder it, and

4    then invest the money in legitimate business to have an

5    everlasting income stream."

6         Your Honor, the search warrant that the government

7    executed earlier this week indicates that the defendant, to

8    some extent, has been successful in that venture.  The

9    government has recovered at this point approximately

10   $4 million in cryptocurrency.

11        There were several -- or numerous devices that law

12   enforcement was able to seize; however, we haven't been able

13   to access those at this time, and so there's a belief that

14   Mr. Hamilton would still have access to a potentially large

15   amount of cryptocurrency.

16        There was approximately $200,000 worth in gold and

17   silver, and approximately $100,000 in U.S. currency, and

18   there are also receipts for what appear to be a Vietnamese

19   bank account which reflect a balance of approximately

20   12 million Vietnamese dong, which I understand at the current

21   exchange rate is only about $500.  But nonetheless, it does

22   go to the international nature of cryptocurrency and this

23   defendant's substantial ties outside this country.

24        Your Honor, it's also, I think, important that as

25   alleged in this indictment, the counterfeit conspiracy was

1    engaged in between June 15th of 2016 and July 5th of 2017.

2    According to the pretrial report, it appears that

3    Mr. Hamilton was on a suspended sentence and/or probation for

4    a larceny conviction during the period he's alleged to have

5    committed the crimes here.

6        Your Honor, the probation report reflects that he

7    does have family in this area, a sister and parents, and the

8    government acknowledges that he has ties here.  However,

9    those ties cut both ways.  The defendant was born in

10   Trinidad.  The government has information that both of his

11   parents are citizens of that country as well.

12       And as I mentioned earlier, there are substantial

13   trips that he appears to have taken to Trinidad based on

14   travel records, including in December of 2016, February of

15   2017, June of 2017, January of 2018, June of 2019, January of

16   2020, June of 2020, and October of 2020.

17       Of course, the defendant is here today.  The

18   government is alleging that he went to Trinidad in December

19   of 2016 and didn't come back, but the information that we

20   have was that there was a one-way ticket purchased to leave

21   this country.

22       There are also suggestion that a good amount of

23   money was moved out of this country since August of 2022.  An

24   Ethereum address that received multiple deposits from a --

25       THE COURT:  I'm sorry, a what address?

1          MR. MOZZI:  Ethereum, which is a type of
2    cryptocurrency, like Bitcoin.
3          -- received multiple deposits from a changenow.io,
4    which is an account linked to Hamilton, and that it sent over
5    1 million Ethereum to the following Binance accounts, all of
6    which were accessed by IP addresses located either in
7    Trinidad and Tobago mostly, or Venezuela:
8          I'm just going to summarize this briefly for Your
9    Honor.
10         Between on or about the 3rd to the 26th of August of
11   2022, an account sent 144,471 United States USDT to
12   the Binance -- to a Binance account that was accessed from
13   IPs geolocated to the Port of Spain and -- I'm going to
14   mispronounce this -- Barataria, B-a-r-a-t-a-r-i-a.  Both of
15   those are cities within Trinidad and Tobago.
16         There was also -- let's see here -- over $200,000 of
17   USDT sent to a Binance account between August and September
18   of 2022, and that Binance account was accessed from IPs
19   geolocated to three different locations within Trinidad and
20   Tobago between August and September of '22.
21         THE COURT:  I need to understand the relevance of
22   this proffer.  Are you saying that these transfers to the
23   Binance account are some way linked to Mr. Hamilton?  How are
24   they linked to Mr. Hamilton?
25         MR. MOZZI:  Yeah.  The accounts are linked to his

```
 1    activity.  There's a specific number that's assigned to this
 2    user.
 3              May I have just a moment, Your Honor?
 4              THE COURT:  Sure.
 5              (Pause in the proceedings.)
 6              MR. MOZZI:  All right.  Thank you, Your Honor.
 7              My understanding is that there is a cryptocurrency
 8    wallet that is registered to Mr. Hamilton and that money went
 9    from that account into several different other accounts, and
10    that money was then further transferred into third accounts
11    that were then accessed from IP addresses geolocated within
12    Trinidad and Tobago and, in some minor cases, in Venezuela.
13    And that happened since August of this year, approximately
14    over 1 million USDT, which is a way of referring to Ethereum,
15    which, again, is a different sort of cryptocurrency.
16              Does that answer your question?
17              THE COURT:  Yes, it does.  I mean, I guess I don't
18    really know what Ethereum is, but is it equivalent to a
19    dollar?  If you say 144,000 USDT, is that $144,000, or is it
20    more like the Vietnamese currency where it might be 50 bucks?
21              MR. MOZZI:  Right.
22              THE COURT:  I don't know what that means.
23              MR. MOZZI:  And, Your Honor, especially with the
24    state of cryptocurrency right now, I don't believe I'm in a
25    position to represent that to you one way or the other.  My
```

1    understanding is that originally Ethereum was intended to be

2    something that was interchangeable with the dollar.

3              THE COURT:  Okay.

4              MR. MOZZI:  However, the value is not really what

5    the government is relying on.  It's simply a large amount of

6    transactions going on since August of 2022 that eventually

7    end up to be accessed from IP addresses in the country where

8    this defendant has significant ties.

9              THE COURT:  Okay.  Got it.

10             MR. MOZZI:  Your Honor, additionally at the

11   residence during the execution of the search warrant, the FBI

12   recovered a driver's license that appears to bear the

13   defendant's likeness, with a different name, from the state

14   of Florida, and the government offers Exhibit 1.

15             THE COURT:  Mr. Hall, would you mind?

16             DEFENSE COUNSEL:  Can I see that?

17             MR. MOZZI:  Yeah.

18             DEFENSE COUNSEL:  Where's the birth date on this?

19             THE COURT:  I redacted the birth date because it's

20   something that's going to be filed, and I didn't want that to

21   be on the public record.

22             DEFENSE COUNSEL:  Thank you, sir.

23             MR. MOZZI:  My understanding is that the Chicago

24   Field Office Operations Center checked and found no record

25   existing for the driver's license number on that identity

1    document.

2          Your Honor, and finally -- and obviously I wasn't

3    present during Mr. Hamilton's interview with Mr. Bell, but

4    it's unclear if he was fully disclosing all of the

5    information to United States Probation.

6          The probation report comes up with an estimated net

7    worth of under $500,000.  Again, there's a substantial amount

8    of United States currency that was at the home and at

9    least -- or approximately $4 million in cryptocurrency assets

10   that were recovered.

11         Furthermore, he claims that he has not had any

12   travel to any other foreign country.  The government

13   understands that he also has traveled to Hong Kong, Japan,

14   and Korea, and there is, as I mentioned earlier, a receipt

15   for what appears to be a Vietnamese bank account that was

16   recovered during the search.

17         Your Honor, for these reasons, because of the

18   defendant's significant ties to a foreign country, because of

19   the nature of the assets which he possessed, and appears to

20   have downplayed or not disclosed to United States Probation,

21   which could be easily accessed anywhere in the world, and

22   quite easily transported, and because of the nature of this

23   offense is essentially one of subterfuge and concealment, the

24   government believes that there are no conditions that would

25   ensure his appearance to court, and moves for his detention.

────────────────── D. Hamilton - Direct ──────────────────

1           THE COURT:  All right.

2           Mr. Campbell or Mr. Bouchard, who is handling things

3     for Mr. Hamilton?

4           MR. CAMPBELL:  Your Honor, Mr. Bouchard is going to

5     handle...

6           THE COURT:  Okay.  Mr. Bouchard, are you going to

7     proceed by proffer or call a witness?

8           MR. BOUCHARD:  I want to call one witness,

9     Ms. Danielle Hamilton, please.

10          THE COURT:  All right.  Ms. Hamilton, would you come

11    forward and be sworn, please.

12          (Witness sworn.)

13          DANIELLE HAMILTON, called by the Defendant, having

14    been first duly sworn, was examined and testified as follows:

15                      DIRECT EXAMINATION

16    BY MR. BOUCHARD:

17    Q.  Good afternoon, Ms. Hamilton.  What is your relationship

18    to the defendant?

19    A.  He's my brother.

20    Q.  Okay.  And how are you employed?

21    A.  I was a former police officer with the City of Suffolk.

22    I resigned November 7th.  I'm currently trying to get into

23    the Isle of Wight Sheriff's Department.

24    Q.  Okay.  So that application is in process currently?

25    A.  Currently, yes.  I had my interview last week.  I turned

D. Hamilton - Direct

1  in all my documents he requested.  I had my ride-along.  The

2  next step is a polygraph and the job offer.

3  Q.  Okay.  So you expect to be hired?

4  A.  Yes.

5  Q.  All right.  And you got a recommendation from your

6  employer.  You left on good terms from Suffolk Police?

7  A.  I did, yes.

8  Q.  Okay.  Now, the reason why you had a gap in your

9  employment, what was the reason for that?

10  A.  I was going to head home for a little while and come

11  back.

12  Q.  Home meaning Trinidad?

13  A.  Yeah, sorry.  Trinidad, yes.

14  Q.  Your family is from Trinidad, right?

15  A.  Yes.

16  Q.  All right.  Do you know why your brother would have had a

17  one-way ticket to Trinidad?

18  A.  He wasn't sure an exact date he was coming back, because

19  we were supposed to return on the 2nd.  He was coming back

20  before us, sometime before the 2nd.

21  Q.  So you had gotten a round-trip for yourself and your

22  daughter?

23  A.  Yes.  Correct.

24  Q.  Because you knew when you were coming back?

25  A.  Correct.

D. Hamilton - Direct

1    Q.   Is that because of your daughter's school schedule?

2    A.   Yes.

3    Q.   All right.  And you heard the U.S. Attorney's proffer.

4    You guys go back and forth to Trinidad often, right?

5    A.   Yes.

6    Q.   In fact, you were going to be leaving today?

7    A.   Yesterday.

8    Q.   Yesterday.  In fact, the family was all going to be

9    going?

10   A.   Yes.

11   Q.   And everybody canceled the trip?

12   A.   Right.

13   Q.   To be here?

14   A.   To be here today, yes.

15   Q.   And to be here for your brother if he's released?

16   A.   Yes.

17   Q.   Now, you were going to be living at his house where he

18   lives with mom?

19   A.   Yes.

20   Q.   All right.  And do you have any -- you've talked with

21   probation.  You've gone through what is expected of you as a

22   third-party custodian?

23   A.   Yes.

24   Q.   So if he's released, you are going to be his babysitter?

25   A.   Correct.

─────────────── D. Hamilton - Direct ───────────────

1   Q.  And you are prepared to do this?

2   A.  Correct.

3   Q.  All right.  Now, you -- I don't -- if they don't have his

4   actual passport, you have no problem finding it and turning

5   it over to the Marshal Service?

6   A.  Yes.

7   Q.  And if he's got to go to Chicago to meet with an

8   attorney, to be arraigned, for trial, all of that, you and

9   the family are prepared to make that happen?

10  A.  Yes.

11  Q.  What is the address where you-all will be living?  You

12  may not have read the pretrial report.  Let me just confirm

13  that briefly, make sure that's correct for everyone.

14          THE COURT:  You don't need to put it in the record.

15          MR. BOUCHARD:  Sorry?

16          THE COURT:  You shouldn't read it into the record,

17  the residential address.

18          MR. BOUCHARD:  Understood.  Yes, sir.

19          THE COURT:  It's in Suffolk, isn't it?

20          THE WITNESS:  Yes.

21          MR. BOUCHARD:  Thank you, Judge.

22          No further questions.  Please answer any questions

23  of the U.S. Attorney or the Court.

24          THE COURT:  Mr. Mozzi, do you have any questions for

25  Ms. Hamilton?

D. Hamilton - Cross

```
 1              MR. MOZZI:  Just very briefly, Your Honor.
 2              THE COURT:  Go ahead.
 3                         CROSS-EXAMINATION
 4   BY MR. MOZZI:
 5   Q.  Good afternoon, ma'am.
 6   A.  Good afternoon.
 7   Q.  Who paid for your plane ticket to Trinidad?
 8   A.  My brother.
 9   Q.  And he paid that in Bitcoin, correct?
10   A.  Correct.
11   Q.  Do you know how much that plane ticket was?
12   A.  About 4,000, I believe.  It was first class.
13              MR. MOZZI:  No further questions.
14              THE COURT:  All right.  Anything else?
15              MR. BOUCHARD:  No, thank you, Judge.  Just argument,
16   please.
17              THE COURT:  All right.  Thank you, Ms. Hamilton.
18   You may have a seat.
19              THE WITNESS:  Thank you.
20              (The witness was excused.)
21              THE COURT:  Any other evidence by way of witness or
22   proffer?
23              MR. BOUCHARD:  No, thank you, Your Honor.  I'm
24   sorry, I thought I had said that.  Just argument to remain.
25              THE COURT:  Okay.  I think I've heard some of your
```

1    argument, but if you want to argue the case further,

2    Mr. Mozzi, I'm happy to hear anything else you want to say,

3    or do you just want me to let Mr. Bouchard respond?

4              MR. MOZZI:  No.  Thank you, Your Honor.

5              THE COURT:  All right.  Mr. Bouchard, do you want to

6    argue the case?

7              MR. BOUCHARD:  Your Honor, I appreciate the gravity

8    of what the U.S. Attorney is describing.  The problem is, is

9    that they're making a lot of assumptions linking things to my

10   client.  I think I heard the word "assume" four or five times

11   with Mr. Mozzi's proffer of the evidence.

12             The fact of the matter is, the one exhibit that they

13   submitted, Judge, if you look at the dates, my client was

14   born in 1997.  What you're looking at is a fake ID that he

15   purchased when he was 19 to make him two years older.  I

16   think we can read through the writing on the walls as far as

17   the purpose of said ID.

18             I'm not going to admit anything on the record, but

19   that is pretty common for college-age gentlemen to try to do

20   what they could to get a beer.  So I think that more than --

21   we don't need to speculate any further on that purpose.

22             But in regard to the one-way ticket, I think we've

23   cleared that up, Judge.  I mean, the fact of the matter is,

24   is that the young man goes back and forth to Trinidad quite a

25   bit.  The fact of the matter is that if he surrenders his

1    passport, nothing -- even if everything were true -- let's

2    just assume -- give the U.S. Attorney the benefit of the

3    doubt -- there's nothing listed in any of the proffer that

4    describes Mr. Hamilton as some kind of covert operative who

5    knows how to get out of the country by covert means.  If he's

6    good about moving money, that's great.  There's not much he

7    can do moving money to physically get himself through an

8    airport or out of the country.

9         If he's got an ankle monitor, if he is monitored by

10   family, if he's monitored by the U.S. Marshal, there's

11   nothing in his history that alleges that he has any of these

12   skill sets.  So even in the light most favorable to the U.S.

13   Attorney's proffer, none of that exists.

14        But let's go through it.  All this is relying on

15   this activity that supposedly occurred 2016 to 2017.  That

16   means for the last five years Mr. Hamilton has been in

17   Suffolk and Trinidad, traveled around, but he's been here.

18   He hasn't hurt anybody.  He hasn't done anything.  He hasn't

19   run.

20        If the theory is -- they're making several different

21   logical assumptions to get to the notion that he's, what, a

22   flight risk?  How?  If he doesn't have a passport, if he

23   doesn't have means to get out, then he's not going anywhere.

24        He's not a danger to society.  There's nothing to

25   suggest whatsoever in regard to his -- there's no violence.

1    He has one petty larceny conviction.  U.S. Attorney tried to

2    allude to the fact that he was on probation.  He was on good

3    behavior for a petty larceny charge when this is alleged to

4    have occurred.

5            But basically what this is all based on is this

6    person on the dark web called Zero Angel that they think they

7    can link to him and then the rabbit hole goes down.  They

8    have a lot to prove this case, Judge.

9            But they literally sat on this for five years, and

10   he hasn't gone anywhere.  They knew exactly where he was.

11   They picked him right up.  So the notion that he's a flight

12   risk is assuming that he is -- has this skill set that they

13   have not described.

14           So I don't think they've met their burden, and I

15   think, as the 1984 bond act requires, that Your Honor should

16   find -- should be able to find a series of conditions that

17   can ensure his compliance and that he appear to court and is

18   not a danger to the community.

19           THE COURT:  Okay.

20           MR. BOUCHARD:  Thank you, Your Honor.

21           THE COURT:  Do you want to say anything further,

22   Mr. Mozzi?

23           MR. MOZZI:  Just briefly, Your Honor.

24           The nature of the crime alleged in the indictment is

25   one of concealment and certainly a crime that's going to

1  require a good deal of investigation and compiling of the

2  evidence.  I think to say -- and I understand the argument

3  that perhaps the government should move fast if we believe

4  there's a flight risk, but this crime itself certainly

5  required a great amount of investigation, and I don't think

6  the fact that there's a great deal of time that's passed

7  necessarily cuts one way or the other.

8          I also just note again, the government is very

9  concerned about the lack of disclosure of this defendant's

10  substantial assets, the gold and silver at the home, the

11  money.  And as his sister admits, I certainly have no reason

12  to believe one way or the other how suitable of a candidate

13  she'd be, but she's flying first class on a ticket purchased

14  with Bitcoin.

15          And that, I think, reflects someone who has an

16  estimated net worth far in excess of what was recorded to

17  Probation, and so for those reasons, unless Your Honor has

18  any further questions, the government --

19          THE COURT:  I don't have any questions.

20          Did you want to say something, Mr. Campbell?

21          MR. CAMPBELL:  Yeah.  I'd just like to speak very

22  quickly, Your Honor.

23          I would just say -- from the probationary report, I

24  would just say, depending on how the questions were asked of

25  my client, there's a possibility he wouldn't have realized

1    the assets because if they were actually taken with a

2    warrant, he wouldn't have given them to the Probation.  So I

3    don't think that should count against him.

4          And second, we keep hearing about these charges that

5    are so complicated and take so long in investigating, and

6    because it's so complicated, that's the reason why he's a

7    flight risk, because it's complicated and no one understands

8    it.

9          Well, if that's the case, as far as I know, the

10   statute doesn't have a presumption.  If it had a presumption

11   that he was a flight risk, it would be a completely different

12   situation, but there is no presumption on these charges that

13   I'm aware of.

14         That being said, I think -- that's all I would say.

15         THE COURT:  Okay.  I understand your argument,

16   Mr. Campbell, and you are correct that there's no presumption

17   that arises.  I think the reason Mr. Mozzi was proffering the

18   complexity of the charges was to respond to Mr. Bouchard's

19   argument that the government has known about Mr. Hamilton's

20   activities since 2016.

21         The indictment describes the conduct of a person who

22   is known as Zero Angel that occurred in 2016, but it's not at

23   all clear when the government came to understand that Zero

24   Angel was Mr. Hamilton, and so I do accept the government's

25   proffer that they did not sit on allegations that they knew

1    Mr. Hamilton had engaged in a conspiracy to sell counterfeit

2    currency since 2016 but that the investigation took some time

3    to discover exactly who Zero Angel was.

4              Frankly, I do think the government has met its

5    burden to show that Mr. Hamilton is a very serious risk of

6    flight, and notwithstanding his family's availability to him,

7    I don't think there are conditions the Court could fashion

8    that would ensure his appearance.

9              The extent of holdings that were recovered during

10   the search and not disclosed to Probation, there's no way he

11   didn't know he had $100,000 of silver and gold -- or $200,000

12   of silver and gold and $100,000 of U.S. currency.

13             And the fact that there are substantial cyber

14   currency assets that have already been seized but there may

15   be substantial cyber currency assets that have not been

16   seized, it's obvious that he has a great facility with these

17   networks and ability to use this income for his benefit and

18   the benefit of his family members.

19             There's extensive ties to a foreign country, where

20   not only him but his custodian and other family members have

21   substantial ties, there's simply too great a risk that, if

22   he's released on bond, he will flee these very, very serious

23   charges with the resources that are available to him.

24             So I'm going to order that he be detained while the

25   case against him is pending.  And I think that's all there is

1    to do here, other than to order a commitment to Chicago where
2    the matter is pending -- I think it's Chicago -- Northern
3    District of Illinois where the matter is pending.
4         Do you know whether Mr. Hamilton is going to be
5    requesting counsel or will be retaining his own attorney to
6    proceed in those matters?
7         DEFENSE COUNSEL:  I would assume he's going to
8    request counsel when he gets there, Your Honor.
9         THE COURT:  Request court-appointed counsel?
10        DEFENSE COUNSEL:  Yes, Your Honor.
11        THE COURT:  Okay.
12        All right.  I've entered an order committing
13   Mr. Hamilton to the Northern District of Illinois, and he'll
14   be remanded to the custody of the United States Marshals for
15   transport there, and once he arrives, proceedings will be set
16   in the Northern District of Illinois for proceeding on the
17   indictment pending against him.
18        Would you mark that as -- admit that as Exhibit 1,
19   Ms. Dodge.
20        And I'll issue a written Detention Order confirming
21   the findings that I've made on the record.
22        Is there anything else, Mr. Mozzi?
23        MR. MOZZI:  No, thank you, Your Honor.
24        THE COURT:  Mr. Campbell or Mr. Bouchard?
25        MR. CAMPBELL:  Thank the Court for moving this up

1    for today.  We appreciate it.

2            THE COURT:  Sure.  That way we were able to get it

3    resolved.

4            All right.  The defendant is remanded.

5            Is that everything we have, Ms. Dodge?

6            THE CLERK:  Yes, sir.

7            THE COURT:  Thank you, all.  The Court will be in

8    recess.

9            (Proceedings concluded at 12:27 p.m.)

10

11                            CERTIFICATION

12

13            I certify that the foregoing is a correct

14   transcript, to the best of my ability, of the court's audio

15   recording of proceedings in the above-entitled matter.

16

17                            /s/

18                       Carol L. Naughton

19                       January 11, 2023

20

21

22

23

24

25