UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| vs. | ) Case No. 1:22-CR-00323 |
| | ) |
| RAHEIM HAMILTON, | ) |
| Defendant. | ) |

**DEFENDANT RAHEIM HAMILTON'S APPEAL OF MAGISTRATE JUDGE'S DETENTION ORDER AND REQUEST FOR IMMEDIATE RELEASE WITH CONDITIONS**

Defendant Raheim Hamilton ("Mr. Hamilton"), by and through his undersigned counsel, respectfully moves this Honorable Court to vacate Magistrate Judge Fuentes's detention order pursuant to 18 U.S.C. § 3145(b) and order Mr. Hamilton released from custody pursuant to the Bail Reform Act (BRA) and the Fifth Amendment's Due Process Clause. Data from the Administrative Office of the U.S. Courts show that there is an exaggerated concern over risk of flight in our system, and that the vast majority of released defendants do not flee. In this case, the government has not met its burden of proving by a preponderance of the evidence that no set of release conditions can reasonably assure Mr. Hamilton's appearance in court. Even if the Court had concerns about potential flight, a location-monitoring condition would effectively address those concerns. Accordingly, Mr. Hamilton must be released on bond immediately with appropriate conditions of release. *See* 18 U.S.C. §§ 3142(a)–(c). This appeal arises under 18 U.S.C. § 3145(b), which provides for *de novo* review of a magistrate judge's detention order. In support of this appeal, Mr. Hamilton states as follows:

1

## I. FACTUAL/PROCEDURAL BACKGROUND

Mr. Hamilton was arrested in the Eastern District of Virginia on December 21, 2022 pursuant to a warrant issued with the indictment in this case charging him with a single count under 18 U.S.C. § 371 of conspiracy to sell, transfer, and deliver false, forged, counterfeited, and altered obligations and securities of the United States, with the intent that the same be passed, published, and used as true and genuine in violation of 18 U.S.C. § 473. ECF No. 1. Mr. Hamilton is one of two defendants charged in the indictment. The other defendant is Thomas Pavey ("Pavey'). In sum, the indictment alleges that Mr. Pavey created counterfeit currency for sale in an online marketplace called AlphaBay, which the government describes as part of the "dark web," while Mr. Hamilton allegedly served as a middleman selling the currency that Pavey manufactured to customers on AlphaBay. *Id.* The indictment does not allege that Mr. Hamilton had any role in creating the alleged counterfeit currency. *Id.*

In the Eastern District of Virginia, the government sought detention solely on the basis that Mr. Hamilton is supposedly a serious flight risk. It did not argue that any presumption in favor of detention applied, or that Mr. Hamilton posed a danger to the community. Following an interview with Pretrial Services in that District, during which defense counsel was not present, Pretrial Services recommended Mr. Hamilton's release on a modest unsecured bond under pretrial services supervision and to a custodian (his sister Danielle Hamilton) with standard conditions. After a detention hearing in that District, however, Magistrate Judge Miller ordered Mr. Hamilton detained as a serious flight risk based on a series of proffers and arguments made by the government that were not disclosed to Mr. Hamilton before the hearing, and which Mr. Hamilton had no opportunity to discuss with his counsel and meaningfully refute during the hearing.

The U.S. Marshals transported Mr. Hamilton to this District, where he was first arraigned on January 18, 2023. Pretrial Services in this District issued a supplemental memorandum to the Eastern District of Virginia's Pretrial Services Memorandum. In that supplemental memorandum, Pretrial Services in the Northern District of Illinois recommended that Mr. Hamilton be released on an unsecured bond under Pretrial Services supervision, with his sister Danielle Hamilton serving as a custodian, and with standard pretrial release conditions.

Mr. Hamilton moved for pretrial release in this District. ECF No. 37. The parties ultimately agreed on a hearing date of February 7. Prior to the hearing, the government filed a transcript of the Eastern District of Virginia detention hearing, ECF No. 39-1, as well as a more detailed brief setting forth the government's detention arguments, ECF No. 50. The government also ultimately filed exhibits it used in support of its arguments. *See* ECF No. 54.

A hearing was held on February 7 before Magistrate Judge Fuentes. Following the hearing, Magistrate Judge Fuentes ordered Mr. Hamilton detained. ECF No. 53. Magistrate Judge Fuentes's order cited two grounds. First, Magistrate Judge Fuentes concluded that because Mr. Hamilton was already ordered detained in the Eastern District of Virginia, in order for another Magistrate Judge to revisit that decision, Mr. Hamilton had to make a threshold showing "that information exists that was not known to the movant at the time of the [previous] hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required." ECF No. 53 at 1 (citing 18 U.S.C. § 3142(f)).[1] Magistrate Judge Fuentes concluded that the information and arguments presented by Mr.

---

[1] As already noted, that standard does *not* apply to this Court's review of the Magistrate Judge's detention order, which is *de novo*. *E.g.*, *United States v. Hammond*, 204 F. Supp. 2d 1157, 1162 (E.D. Wis. 2002) ("When the decision of a magistrate judge is appealed to the district court under section 3145(a), the district judge conducts a *de novo* review.").

3

Hamilton at the February 7 hearing were known to Mr. Hamilton during the previous December hearing in the Eastern District of Virginia. *Id.* at 2.

Second, Magistrate Judge Fuentes concluded that even if Mr. Hamilton made the threshold showing of new information, the government had established by a preponderance of evidence that "no release conditions exist that would reasonably assure" Mr. Hamilton's appearance. *Id.* at 2. Magistrate Judge Fuentes specifically emphasized three "concerns": (1) the government's proffered evidence of that Mr. Hamilton "had or has access to considerable liquid assets"; (2) Mr. Hamilton's ties to Trinidad where his family resides and Vietnam where his girlfriend resides; and (3) what Magistrate Judge Fuentes concluded was a "considerable lack of disclosure" of assets during the detention hearing process in the Eastern District of Virginia. *Id.* Mr. Hamilton was also on misdemeanor, unsupervised probation for his only prior conviction when he allegedly committed the offense, which the Court noted. *Id.*

## II. ARGUMENT

### A. Detaining a Defendant as a "Serious Risk of Flight" Is Appropriate Only in "Extreme and Unusual Circumstances."

The BRA's legislative history makes clear that detention based on serious risk of flight is only appropriate under "extreme and unusual circumstances."[2] For example, the case relied on in the legislative history as extreme and unusual enough to justify detention on the grounds of serious

---

[2] *See* Bail Reform Act of 1983: Rep. of the Comm. on the Judiciary, 98th Cong. 48 (1983) ("Under subsection f(2), a pretrial Detention Hearing may be held upon motion of the attorney for the government or upon the judicial officer's own motion in three types of cases. . . . [T]hose [types] involving . . . a serious risk that the defendant will flee . . . reflect the scope of current case law that recognizes the appropriateness of denial of release in such cases.") (emphasis added) (citing *United States v. Abrahams*, 575 F.2d 3, 8 (1st Cir. 1978)—which held that only a "rare case of extreme and unusual circumstances . . . justifies pretrial detention"—as representing the "current case law"); *see also Gavino v. McMahon*, 499 F.2d 1191, 1995 (2d Cir. 1974) (holding that in a noncapital case the defendant is guaranteed the right to pretrial release except in "extreme and unusual circumstances"); *United States v. Kirk*, 534 F.2d 1262, 1281 (8th Cir. 1976) (holding that bail can only be denied "in the exceptional case").

risk of flight involved a defendant who was a fugitive and serial impersonator, had failed to appear in the past, and had recently transferred over a million dollars to Bermuda. *See Abrahams*, 575 F.2d at 4. The government must demonstrate that the risk of flight in a particular case rises to the level of extreme or unusual, and no such showing has been made here. In addition, a defendant should not be detained as a "serious risk" of flight when the risk of nonappearance can be mitigated by conditions of release. The only defendants who qualify for detention under § 3142(f)(2) are those who are "[t]rue flight risks"—defendants the government can prove are likely to willfully flee the jurisdiction with the intention of thwarting the judicial process.

### B. Mr. Hamilton Is Not a Serious Flight Risk and Conditions of Release Will Reasonably Assure His Appearance.

Mr. Hamilton is a citizen of the United States[3] and has lived in the Suffolk area of Virginia for approximately sixteen years, *i.e.*, since the age of ten. He has extensive and longstanding family ties in that area. This includes his entire nuclear family consisting of his mother, father, and two sisters, plus extended family including an uncle's family and a cousin.

Mr. Hamilton's ties with his family are close. His mother, who has appeared at all three of Mr. Hamilton's court appearances in Chicago despite living in Virginia and knowing she would likely be unable to communicate with him while he is in custody, operates a power washing business that Mr. Hamilton assists with from time to time. His sister, who was also present at Mr. Hamilton's detention hearing in Virginia as well as the detention hearing in Chicago, has worked in law enforcement and has volunteered to serve in the role of custodian.

Mr. Hamilton has also invested in real estate in the Suffolk area. He owns a self-managed triplex investment property. Currently, only one of the three units is occupied by a renter, in part

---

[3] Mr. Hamilton, as well as both of his parents, are dual citizens of both the United States and Trinidad and Tobago.

because Mr. Hamilton was in the process of locating additional tenants when he was arrested, and he has been unable to coordinate the process effectively while in custody. Mr. Hamilton also owns the property in Suffolk where his mother and two sisters reside.[4]

Mr. Hamilton has only one prior conviction – a misdemeanor state theft conviction for which he received a suspended sentence and unsupervised probation. The government and Pretrial Services have proffered no evidence or argument that Mr. Hamilton has ever failed to appear in connection with that case or any other court proceeding. This supports the conclusion that he is not a serious flight risk. *See, e.g., United States v. Williams*, 1988 WL 23780, at *1 (N.D. Ill. Mar. 8, 1988) (defendant who made regular state court appearances in the past deemed not a serious flight risk).

Given these longstanding and strong community ties, the following conditions of release under § 3142(c)(1)(B) recommended by Pretrial Services, and any other conditions the Court deems necessary, will reasonably assure Mr. Hamilton's appearance in court:

- placing Mr. Hamilton in custody of a third-party custodian – his sister Danielle Hamilton who has been vetted by Pretrial Services and approved as a custodian -- "who agrees to assume supervision and to report any violation of a release condition to the court" (§ 3142(c)(1)(B)(i));

- maintaining or actively seeking employment (§ 3142(c)(1)(B)(ii));

---

[4] The triplex Mr. Hamilton purchased not long ago for approximately $527,000, and there is no mortgage on the property. The family-occupied residence was purchased for approximately $460,000 with a 20% down payment and a mortgage.

6

- following restrictions on "personal associations, place of abode, or travel," which here would limit travel to the Eastern District of Virginia and the Northern District of Illinois (§ 3142(c)(1)(B)(iv));[5]

- surrendering all passports to Pretrial Services and not obtaining any new ones or other international travel documents ((§ 3142(c)(1)(B)(xiv));

- reporting on a "regular basis" to Pretrial Services ((§ 3142(c)(1)(B)(vi)); and

- remaining standard conditions of release recommended by Pretrial Services (*e.g.*, no firearms or unlawful drugs, reporting law enforcement contacts, drug testing and treatment if deemed appropriate, etc.) ((§ 3142(c)(1)(B)(xiv)).

C. **The Government's Proffered Facts and Argument Do Not Satisfy the Government's Burden.**

The government's proffered facts and arguments are not persuasive and fail to meet the government's burden of establishing by a preponderance of the evidence that no conditions of release can reasonably assure Mr. Hamilton's appearance. The government's arguments fall into three basic categories: (i) Mr. Hamilton's assets, (ii) Mr. Hamilton's international ties, and (3) a hodge podge of other facts mostly related to the nature of Mr. Hamilton's alleged crime, his possession of allegedly false identity documents, and his statements to Pretrial Services. None of these arguments individually or combined justify Mr. Hamilton's pretrial detention.

1. Mr. Hamilton's Assets

The government suggests Mr. Hamilton is a serious flight risk because the government believes Mr. Hamilton earned a significant amount of digital currency through the charged crime,

---

[5] While Mr. Hamilton does not agree it is necessary nor has Pretrial Services recommended it, Mr. Hamilton's location could also be subject to electronic or GPS monitoring if the Court deemed it necessary.

which assets the government believes it has not fully located. ECF No. 50 at 5. But even if the government were correct, the possession of assets neither enables anyone to travel without a passport, nor serves as an incentive by itself to flee. The BRA does not provide pretrial release only for relatively poor individuals charged with a crime who could not afford to spend money on travel if they decided to flee. Rather, because the government has failed at the threshold to proffer facts (i) that Mr. Hamilton actually *would* flee prosecution despite his close and extensive ties to the community – which would involve forfeiting any bond, subjecting his sister to negative consequences as his custodian, and forever abandoning his nuclear family he has been demonstrably close with for the past 16 years – and (ii) that with access to money he has the wherewithal to leave the United States without a passport, it is simply immaterial that Mr. Hamilton, like countless defendants released on bond, has assets that could be spent on travel.

For the same reasons, the government's proffered facts about other assets found in Mr. Hamilton's possession during execution of a search warrant do not meaningfully advance the government's detention argument. Specifically, the government proffered that it seized approximately $200,000 worth of gold and silver, plus approximately $100,000 in cash. Mr. Hamilton cannot use seized assets to flee. To the extent the government is hinting that these types of assets are associated with illegal activity, that is an argument related to Mr. Hamilton's guilt or innocence -- not whether conditions can reasonably assure his appearance in court. Indeed, much of the government's memorandum in support of detention submitted to the Magistrate Judge ultimately boiled down to proffered chat logs the government argues show that Mr. Hamilton was committing crimes. *See* ECF No. 50 at 9-10 (describing chats allegedly showing transactions to send cash through the mail and to exchange cryptocurrency for cash), 12-13 (describing chats supposedly indicative of "money laundering"), 13-15 (additional chats supposedly showing that

8

Mr. Hamilton "has admitted to criminal conduct" and allegedly showing that he "is guilty of the charged conduct").

But the weight of the evidence against the defendant, particularly in a case like this, is the least important factor bearing on detention. *See, e.g.*, *United States v. Radick*, No. 05 CR 798-2, 2006 WL 436116, at *3 (N.D. Ill. Feb. 17, 2006) ("The charge, at this stage, is an accusation. The weight of the evidence against him is the "least important of the various factors." (internal citation omitted)); *United States v. Caro*, 2005 WL 8160735, at *3 (N.D. Ill. Nov. 2, 2005) (same). Even if strong evidence of certain criminal behavior could theoretically bear on the issue of flight *(e.g.,* if the charged conduct involved international travel under an assumed identity – this is not one of those cases. Mr. Hamilton is alleged to have helped his co-Defendant sell counterfeit currency through the Internet while Mr. Hamilton was maintaining a stable residence with his family in Virginia. Supposedly strong evidence of that conduct has no bearing at all on whether Mr. Hamilton would appear in Court if released on appropriate conditions.

2. Mr. Hamilton's International Ties

Mr. Hamilton has regularly taken trips to Trinidad and Tobago, where he was born and where his grandparents live. More importantly, after visiting family, he always returns home to live in Virginia where he has lived for sixteen years. The government's listing of numerous other countries that Mr. Hamilton supposedly has ties to is misleading and wrong. *See* ECF No. 50 at 8-9 (mentioning Vietnam, Hong Kong, Japan, South Korea, and the United Kingdom.) In fact, Mr. Hamilton has traveled to *one* other country besides Trinidad and Tobago: Vietnam. He has traveled to Vietnam a few times because that is where his girlfriend – who he met when he was 17 years old and has been with ever since – lives.

The government's references to travel to Hong Kong, Japan, and South Korea are all

9

references to airport layovers Mr. Hamilton had while traveling to and from Vietnam. He never left the airport in those countries nor traveled there other than while in transit to and from Vietnam. The government reluctantly and obliquely conceded as much in its memorandum. *See* ECF No. 50 at 8 (stating that the travel to Hong Kong, Japan, and South Korea was "consistent with travel to Vietnam"). The only tie to the United Kingdom the government mentions is a chat with someone apparently located in the United Kingdom where Mr. Hamilton was supposedly proposing to send cash through the mail to that contact. ECF No. 50 at 9. The government has not and cannot allege that Mr. Hamilton has any close friends or family in the United Kingdom or has ever set foot in that country. Rather, this is just another example of the government proffering a chat log it thinks shows some type of illegal transaction, this time with someone in the United Kingdom. Whether or not the government is correct, it has not established any kind of meaningful ties to the United Kingdom suggesting Mr. Hamilton would flee there.

The government also references overseas property ownership, which in Mr. Hamilton's case is a family-occupied residence in Trinidad and Tobago. Specifically, Mr. Hamilton is only on title to a single property outside of the United States: he is the one-third owner of a family property occupied by his grandmother and other family in Trinidad and Tobago. (The government's memorandum included photos of construction on that family property, *see* ECF No. 50 at 11.) While Mr. Hamilton had explored purchasing additional property in Trinidad and Tobago as investments, those transactions were never finalized. Having a partial interest in one family-occupied property and helping to renovate it is indicative of being a financially helpful family member who happens to have family abroad – it is not indicative of the kind of extensive overseas investment and property ownership reflecting a plan or desire to have options for fleeing the country.

10

The government's final argument about Mr. Hamilton's "foreign ties" is a self-defeating narrative about efforts to supposedly "mov[e] money overseas." ECF No. 50 at 9-11. The problem with the government's argument is that it implies there is some flight-suggestive purpose behind these transactions, when in fact the government's own chats and arguments show that the alleged transactions were all expressly designed to assist with the purchase and renovation of the family property in Trinidad and Tobago. *Id.* Obviously to be involved in purchasing and renovating a family property in Trinidad and Tobago, Mr. Hamilton had to spend money there to do it. Again, there is nothing suspicious about helping purchase a family-occupied property nor is such activity suggestive of a serious flight risk.

3.  The Government's Other Arguments

The government's remaining set of proffers and arguments misstate and overstate Mr. Hamilton's alleged role in the charged crimes and his conduct since being arrested. The government first suggests that the nature of Mr. Hamilton's charged crime as involving a "dark web" marketplace means he has a facility for travelling internationally under assumed identities "more than most." ECF No. 6-7. But the actual indictment and the government's own recitation of Mr. Hamilton's travel history tell a very different story. According to the government, Mr. Hamilton's co-defendant was the individual responsible for creating the alleged counterfeit currency, while Mr. Hamilton allegedly served in the role of middle-man salesman connecting the co-defendant with customers. None of that even allegedly involves familiarity with fake travel documents or secret international travel. Likewise, the government has not proffered that Mr. Hamilton ever traveled (or attempted to travel) under an assumed identity; rather, the government has described in detail Mr. Hamilton's international travel history, which is all reflected in records under his own name. The inference that anyone with supposed knowledge of how to buy illegal

11

goods online is also therefore capable of clandestine international travel (which, again, the government has not argued that he has attempted or done before) is simply a bridge too far.

For similar reasons, the government's efforts to link Mr. Hamilton to allegedly false identification documents carries little weight on the issue of flight risk. According to the government, Mr. Hamilton had in his possession a fake Florida driver's license in a different name and a bank card in another different name. The government proffered that the bank card was linked to transactions using an IP address "associated with Hamilton's then-home address." ECF No. 50 at 7-8. The government has not proffered any facts that Mr. Hamilton ever attempted to travel under the names associated with those documents -- or even ever used the Florida license at all. The government argues that the bank card was used to "purchase items and withdraw cash" in the region where Mr. Hamilton lived, but the government did not detail how much cash or what kinds of purchases were involved -- presumably because those details do not in any way link the card to attempted travel or otherwise bear on whether Mr. Hamilton would comply with court-ordered release conditions.

The government also seeks to fault Mr. Hamilton for supposedly not fully disclosing his assets and international travel, and not mentioning to Pretrial Services the allegedly fake identity documents. The extent of any non-disclosure is highly speculative because Mr. Hamilton was not represented by counsel during the interview, it is unclear how the questions to him were phrased, and without clarification and counsel many lay people consider, for example, assets seized by the government that they can no longer access not to be their assets anymore. The government's theory that Mr. Hamilton willfully omitted his partial ownership interest in the family property in Trinidad and Tobago is also inconsistent with the remaining answers he gave because Mr. Hamilton was clearly not trying to hide his ties to Trinidad and Tobago. Even if he omitted

12

mention of the property through error or oversight, he openly disclosed his dual citizenship, family ties, and regular travel to and from that country, so clearly he was not trying to mislead Pretrial Services about his connections to that country.

Similarly, the idea that Mr. Hamilton willfully withheld his limited international travel to Vietnam is far-fetched. Mr. Hamilton disclosed his regular travel and ties to Trinidad and Tobago, by far his most significant foreign travel, and he had no reason to conceal travel under his own name to a place where he has no assets, no property, and only went to visit his girlfriend a few times. More likely the question was unclear or he simply forgot after being asked several detailed questions about the more regular travel to and from Trinidad and Tobago.

It is unclear what question the government believes Mr. Hamilton was not truthful about regarding the allegedly fake driver's license and bank card. There is no statement in the Pretrial Services report indicating that that Mr. Hamilton was ever asked about non-travel identification or bank cards.

Finally, the government pointed out during the detention hearing that Mr. Hamilton was on unsupervised probation for a misdemeanor petty theft conviction (which is his only prior conviction) during the period the government alleges he committed the crimes in the indictment. But being accused (and not yet proven) to have engaged in illegal conduct while on unsupervised misdemeanor state probation cannot be used as a proxy for how an individual subject to supervised federal pretrial release, monitored by a custodian with a law enforcement background, and subject to whatever bond or other conditions the Court deems appropriate here, would behave.

### D. Statistics Demonstrating It Is Extremely Rare for Defendants on Bond to Flee Confirm that the Government Has Not Met Its Burden Here.

Official Court statistics show that when release increases, flight does not. This Court should be guided by Administrative Office (AO) statistics showing that nearly everyone released

pending federal trial appears in court. In fact, in 2019, 99% of released federal defendants nationwide appeared for court as required.[6] Significantly, this near-perfect compliance rate is seen equally in federal districts with very high release rates and those with very low release rates.[7]

The bond statistics for this District likewise strongly suggest that Mr. Hamilton should be released. In this District, released federal defendants appeared for court 99.45% of the time in 2019 (*i.e.*, 1260 cases in release status with only 7 failures to appear). *See* Table H-15. Yet, despite the statistically low risk of flight that defendants like Mr. Hamilton pose, the government recommends detention in 77% of cases nationwide and in 67% of cases in this District. *See* AO Table H-3, https://www.uscourts.gov/sites/default/files/data_tables/jb_h3_0930.2019.pdf. Clearly the government's detention requests are not tailored to the low risk of flight that defendants in this District and elsewhere pose.

Mr. Hamilton must be released on conditions because the government has not established that he would be among the approximately 1% of defendants who fail to appear in court. In addition, the government's concerns could all be effectively addressed by the proposed conditions of release, including GPS monitoring if deemed necessary by the Court. Continuing to detain Mr. Hamilton on this record would violate his constitutionally protected liberty interest.

---

[6] AO Table H-15 ("Table H-15") (Dec. 31, 2019), *available at* Mot. for Bond, *United States v. Rodriguez*, No. 19-CR-77 (E.D. Wis. Apr. 2, 2020), ECF No. 41, Ex. 1, archived at https://perma.cc/LYG4-AX4H (showing a nationwide failure-to-appear rate of 1.2%).
[7] The data showing near-perfect compliance on bond is illustrated in the chart, "Federal Clients on Bond Rarely Flee or Recidivate." The districts with the highest and lowest release rates were identified using the version of AO Table H-14A for the 12-month period ending December 31, 2019. *See* AO Table H-14A (Dec. 31, 2019), https://perma.cc/32XF-2S42. The failure-to-appear rate for these districts was calculated using App 1, AO Table H-15. With regard to flight, the ten federal districts with the lowest release rates (average 26.00%) have an average failure-to-appear rate of 1.37%, while the ten districts with the highest release rates (average 65.58%) have an *even lower* failure-to appear rate of 0.87%.

### III. CONCLUSION

For these reasons, Mr. Hamilton respectfully asks this Court to vacate the detention order and order him released on conditions this Court deems appropriate under §§ 3142(a)–(c).

                                                  Respectfully submitted,

                                                  */s/William J. Edelman*
                                                  WILLIAM J. EDELMAN

                                                  *Attorney for Raheim Hamilton*

Delahunty & Edelman LLP
200 E. Randolph St.
Suite 5100
Chicago, IL 60601
Ph: (312) 820-2501
Fax: (415) 891-6256
Email: wedelman@delawllp.com

### CERTIFICATE OF SERVICE

The undersigned states that, on February 16, 2023, he caused the above to be served on counsel of record by way of ECF filing.

                                                  Respectfully submitted,

                                                  */s/ William J. Edelman*
                                                  WILLIAM J. EDELMAN

                                                  *Attorney for Raheim Hamilton*