1          **TRANSCRIPTION OF DIGITAL RECORDING**

2                IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
3                        EASTERN DIVISION

4    UNITED STATES OF AMERICA,        ) Case No. 22-CR-323
                                      )
5                    Government,      )
                                      ) MOTION HEARING
6    vs.                              )
                                      )
7    (2) RAHEIM HAMILTON,             ) Chicago, Illinois
                                      ) Date:  February 7, 2023
8                    Defendant.       ) Time:  9:00 a.m.
     _____

9
          AUDIO TRANSCRIPTION OF RECORDED MOTION HEARING
10                       HELD BEFORE
        THE HONORABLE MAGISTRATE JUDGE GABRIEL A. FUENTES
11             UNITED STATES MAGISTRATE JUDGE
     _____

12
                      A P P E A R A N C E S
13
     For the Government:        Melody Wells, AUSA
14                              United States Attorney's Office
                                Northern District of Illinois
15                              219 South Dearborn Street
                                Chicago, Illinois  60604
16                              312-353-1110

17   For the Defendant:         William Edelman, Esq.
                                Delahunty & Edelman LLP
18                              200 East Randolph Street, Suite 5100
                                Chicago, Illinois  60601
19                              312-820-2501

20   Also Present:             Judith Lesch, Pretrial Services

21
     Proceedings recorded by Liberty digital-recording system;
22   transcript produced by audio transcription.

23   Transcriber:              Annette M. Montalvo, CSR, RDR, CRR
                               Official Court Reporter
24                             United States Courthouse, Room 1902
                               219 South Dearborn Street
25                             Chicago, Illinois  60604
                               312-818-6683

1    (Proceedings commenced at 9:04 a.m., in open court, and are

2    transcribed from a Liberty audio recording, to wit:)

3         THE COURTROOM DEPUTY:  Calling Case No. 22-CR-323,

4    *USA v. Hamilton* for motion hearing.

5         THE COURT:  Let's have counsel make their appearances

6    for the record.  And you're all welcome to remain at counsel

7    table, if you wish, instead of coming to the podium.  But then

8    I need you to speak into these microphones so our Liberty

9    recording picks up everybody's voices.

10        So government first with appearances, please.

11        MS. WELLS:  Yes, Your Honor.  Melody Wells for the

12   United States, and I'm joined at counsel's table by Special

13   Agent Tim Alec and Mike Todd.

14        THE COURT:  Thank you.

15        MS. WELLS:  From the FBI and United States Postal

16   Inspection Service Inspector.

17        THE COURT:  Okay.  And how about defense today.

18        MR. EDELMAN:  Good morning, Your Honor.  William

19   Edelman for the defendant Raheim Hamilton.

20        THE COURT:  Okay.  Mr. Hamilton, present in court

21   today.

22        So here's why we're here, right.  It's a detention

23   hearing, really, on the motion that the defense filed, which

24   is document number 37, motion for pretrial release.  And

25   movant carries the burden, although the government, I think,

1    always has the burden of establishing that, you know, there's

2    no set of release conditions that will reasonably assure

3    appearance.  That's the ground on which detention has been

4    sought.

5            Ms. Wells, that's still the case, right?  There's no

6    contention that community safety is a reason for detention?

7    Am I right about that?

8            MS. WELLS:  That's correct.  Our argument is based on

9    flight risk.

10          THE COURT:  Okay.  So they still have the burden on

11    that, but I thought, Mr. Edelman, we would let you go first.

12    But I do want you to begin with an argument as to why the

13    Court should re-open the detention hearing.  He was in the

14    Eastern District of Virginia, there was a detention hearing,

15    so a decision was made to have that hearing in the district of

16    arrest and not here.

17          That hearing resulted in an order of detention.  And

18    you quoted 3142(f) correctly in your motion.  You have to have

19    something that was not known to you at the time of the

20    detention hearing.  I read your motion, and I'm challenging

21    you a little bit on that because as I read your motion, the

22    defendant's not happy with how that motion was argued.  Many

23    of the arguments are the same, that he can't travel without a

24    passport, that the government's facts about the one-way ticket

25    to Trinidad are not fleshed out well enough because he really

1    just didn't know when he'd be coming back.  That he traveled

2    to Trinidad a lot.  That he traveled to Vietnam some because

3    he has a girlfriend there.

4           These are all things that were known at the time of

5    the detention hearing, initially.  So I'm not seeing anything

6    new.  I want us to begin with challenging you on that, but I

7    also want to let you argue why do you think the conditions

8    exist that do reasonably assure appearance.  So go ahead.

9           MR. EDELMAN:  Thank you, Your Honor.

10          I do agree that to the extent there's any burden here

11   on Mr. Hamilton, it would only be to establish that revisiting

12   the decision is appropriate.  Once that hurdle is cleared, I

13   think the burden remains on the government to establish, and I

14   believe that's what Your Honor just said --

15          THE COURT:  Agreed.

16          MR. EDELMAN:  Yes.

17          So on that point, Your Honor, I believe there are

18   significant additional facts, both in responding to what the

19   government argued in Virginia, not just legal arguments, but

20   facts to counter the facts that they offered that were not

21   presented in Virginia.  And there was no reasonable

22   opportunity for him, I understand --

23          THE COURT:  Okay.  Not presented is different than

24   not knowing.  So everybody gets kind of held responsible for

25   what they put in the court and what they didn't.  You don't

1   get an unlimited number of bites at the apple.  But I'm sorry

2   to interrupt you.  You were about to explain.

3         MR. EDELMAN:  Well, certainly a few examples,

4   Your Honor.

5         As to the international travel, the government in the

6   Eastern District of Virginia, the government may have a more

7   nuanced view now, but at the time argued that Mr. Hamilton had

8   been traveling to multiple countries.  That's simply not true.

9   He traveled to Vietnam, he had stopped for a few layovers, I

10  believe it's Korea, Japan, there was a third country.

11        THE COURT:  Yeah.  I didn't -- Hong Kong.  I didn't

12  find that persuasive anyway.  I was more concerned about -- so

13  I'm just letting you know, I'm more concerned about degree of

14  foreign ties and involvements in Trinidad and in Vietnam.

15        So there's two places to go.  And per your motion, I

16  agree that the possession of assets, even undisclosed assets,

17  doesn't necessarily equate to a motivation to flee, but it

18  does go to ability.  It does go to the ability to live in

19  another jurisdiction and sustain oneself and get there.

20        So address those, if you would.

21        MR. EDELMAN:  Yes.  I do -- Your Honor, I believe

22  that's the order that needs to be asked.  The first question

23  is, is there a serious motive to flee.  Every defendant

24  charged in federal court has arguably an incentive to flee.

25  So what is it that's unusual about this case that creates the

1    serious risk, number one.

2         Number two, it obviously cannot be that only

3    defendants who lack the funds, who are essentially poor or

4    could not spend enough money to leave the country are eligible

5    to be released in a case where they're charged with a federal

6    crime.  There are numerous defendants who are released all the

7    time in federal court when they're charged with crimes that

8    are considered serious and they're white collar, but they

9    simply -- the fact that they have money that they could spend,

10   but that they won't because their demonstrated history of ties

11   to the community is so strong, which is definitely the case

12   with Mr. Hamilton, does not carry the government's burden of

13   showing there's a serious flight risk.

14        So I think I'd want to emphasize, clearly Your

15   Honor's reviewed the documents, but it's hard to overstate the

16   extent of the ties here in the United States, and

17   Mr. Hamilton's consistent residence here, and despite the

18   international travel that the Court has expressed some

19   reservations about, he's always returned.  Yes, he's gone to

20   Trinidad and Tobago, he has very good reasons to do that, he's

21   visiting family.  Likewise, to Vietnam, he's visiting a

22   girlfriend.  Those are very innocuous reasons to go, and he's

23   always returned.  The government seems very concerned about

24   what he's been doing, and most of the government's arguments

25   in their brief seem to go to the weight of the evidence

1    against the defendant and the pending charges which the

2    authorities have cited show the least important factor in

3    this.

4         Whether or not he did what the government thinks he's

5    done, the question here is whether he has so many ties it's

6    likely he would flee, and what evidence they have that he has

7    the means to do that in terms of being able to travel out of

8    this country without a passport, or to obtain some type of

9    travel documents that would enable him to leave, there's some

10   suggestion he could do that.  They have no evidence he ever

11   has or has attempted to do so but could.  That sounds like a

12   very challenging thing to do.

13        And turning back to Your Honor's first question of

14   the facts not known to the defense, I think mostly it has to

15   go to responding to surprise arguments by the government that

16   Mr. Hamilton just reasonably didn't have an opportunity to

17   consult with his counsel during that prior hearing.  I think

18   these are important facts.  Mr. Hamilton should not be

19   detained pretrial simply because he didn't have his counsel

20   with him when -- during his pretrial services interview, and

21   also when the government surprised him with new facts during

22   the hearing, he didn't have an opportunity to talk through,

23   tell me the details about this.

24        THE COURT:  I'm going to challenge you on that

25   because I think it would have been well within his ability and

1  counsel's ability to say, oh, wait a minute.  We don't know

2  anything about this.  I want to adjourn the hearing.  I want

3  to see what our response potentially would be.  Instead, they

4  went forward with the hearing, and they argued, forcefully,

5  that he can't travel without a passport.  That his ties in

6  Virginia are extensive.  That his travel to Trinidad was

7  common family type travel that wouldn't heighten flight risk.

8  All those things were argued.

9       The another thing I want to tell you that I was

10 concerned about, you can respond to this if you want, was when

11 you talk about his not having been represented at the pretrial

12 services interview, I think what you're addressing is the fact

13 that in the initial interview -- and, by the way, do we have a

14 pretrial services representative here on the phone or present?

15 I should make sure we do.

16      THE PRETRIAL SERVICES OFFICER:  Yes, Your Honor.

17 Judith Lesch on behalf of Pretrial Services.

18      THE COURT:  Excellent.  Thank you.

19      So, you know, I think what you're saying is, without

20 representation of counsel, without giving it enough thought,

21 that might explain why he only disclosed a net worth of

22 482,000, which was the Virginia properties, less the mortgage

23 on one of those properties.  And why he wouldn't have

24 addressed any crypto assets, the government now says those may

25 have been worth $4 million.  I don't know how much any crypto

1    is worth today, but they say they recovered cash, they say

2    they recovered gold and silver, and I'm going to read into the

3    record the response to that that appeared in your motion

4    because I think it, to me, raises a question, right.

5         You mentioned that he's an early adopter in this

6    trading space.  And on page 8, Mr. Hamilton has been an

7    amateur investor for some time.  Mr. Hamilton's decision to

8    spread his investments and assets across a range of risks

9    profiles from conservative, i.e., real estate, to moderate,

10   i.e., precious metals, to volatile with extreme upside, i.e.,

11   digital currency, while maintaining a cash reserve in very

12   uncertain global market conditions makes his financial

13   portfolio diverse, but it does not make him a serious flight

14   risk.

15        Well, setting aside for a minute the question I

16   raised about ability to flee by virtue of assets, and setting

17   aside for a minute what our standard is, it's not serious

18   flight risk.  That's the standard for whether a hearing can be

19   held.  The standard is, is there a set of conditions that will

20   reasonably assure appearance, and the burden is preponderance

21   only slightly more likely than not.  It's not a big burden for

22   them.  We have to confront that.

23        But what that paragraphs told me was, this is a

24   person, kind of sophisticated.  Maintained this diverse

25   portfolio.  Hedged his bets with his cash reserve.  You know,

1   it bespeaks a level of sophistication that suggests to me that

2   if you're asked in a pretrial services interview to state your

3   assets, you're not just going to mention the house.  You're

4   going to say, I'm an early adopter in this trading space.

5   I've got a cash reserve.  I've got precious metals.  I've got

6   property, including the government now says there's some

7   property in Trinidad that wasn't disclosed.

8           So, to me, first of all, it indicates that this is

9   not information that he didn't already have, but a heightened

10  concern a little bit that just didn't get disclosed initially,

11  and that the reason for it not being disclosed is not

12  persuasive.  Mr. Hamilton, you know, according to your own

13  motion, he didn't just fall off a turnip truck.

14          MR. EDELMAN:  So, Your Honor, thank you for giving me

15  the opportunity --

16          THE COURT:  Yeah.

17          MR. EDELMAN:  -- to address that.

18          I think that it's inartfully phrased by counsel.  The

19  point there is that the government's -- if you accept the

20  government's evidence that this was all his, and Mr. Hamilton

21  certainly is not doing that.  I think he's being put in a very

22  difficult situation of where he's being asked to admit or deny

23  some of the critical, in the government's view, financial

24  facts underpinning his guilt or innocence in the case to

25  address the issue of detention.  He's alleged to be part of a

1    conspiracy.  It's totally unclear.  That money could be

2    anybody's, one of his alleged known and unknown conspirators.

3    Again, that is not a proffer I'm making.  My point is, if the

4    government were correct that those were his assets, don't --

5    he wasn't -- nobody was present to explain.  I did not hear

6    the question that the Pretrial Services officer asked him.  I

7    know that, obviously, Pretrial Services is never trying to

8    trick a defendant, but sometimes people misunderstand.

9    Nothing counsel can do to explain away.  What I was talking

10   about, this or that, and -- I don't know how the question was

11   phrased.

12           THE COURT:  Okay.  None of us does, but that's true

13   all the time.  You know, Pretrial Services is something the

14   Court relies on.

15           MR. EDELMAN:  Absolutely.  And I will note in this

16   case, Your Honor, that Pretrial Services, having reviewed the

17   transcript from the Eastern District of Virginia, has

18   continued to recommend release in this case on an unsecured

19   bond without onerous conditions.

20           THE COURT:  Okay.

21           MR. EDELMAN:  I don't know that the Pretrial Services

22   had a chance to review the government's latest memorandum.  My

23   understanding is that their position has not changed this

24   morning as to recommendations of release.

25           THE COURT:  Okay.  Is that true, Ms. Lesch?  Position

1    not changed?

2              THE PRETRIAL SERVICES OFFICER:  That is correct,

3    Your Honor.

4              THE COURT:  Okay.  And was it 25,000 unsecured bond

5    that you were recommending?  Did I have that right, or no?

6              THE PRETRIAL SERVICES OFFICER:  Pretrial Services in

7    the Northern District of Illinois, Your Honor, is recommending

8    an unsecured bond.

9              THE COURT:  Of how much face value?

10             THE PRETRIAL SERVICES OFFICER:  No amount is set

11   (inaudible; off mike), Your Honor.

12             THE COURT:  Okay.  Thank you.

13             Mr. Edelman, go on.  I don't want to cut you short,

14   but when you're done, I want to hear from Ms. Wells.

15             MR. EDELMAN:  I believe Your Honor's addressed most

16   of the key issues.  I think the points I want to emphasize is

17   that the majority of the government's additional facts

18   proffered appear to be evidence that the government believes

19   it has very strong evidence that Mr. Hamilton did what he's

20   charged with doing.

21             I don't think any of those really very strongly go to

22   the issue of whether he has ever even tried to travel under

23   some assumed identity or with a fake identity document, that

24   he has any knowledge of how to do that, or that he would do

25   that.

1      THE COURT:  Okay.  Let me have you respond to one

2  thing, though, because it was another concern.  It was in the

3  government's response.  It was on page -- I have to find it.

4  Just give me a moment.  You know, I have all the these pages

5  where I've circled things, but I didn't use a Post It to flag

6  the page that I was most interested in.

7      All right.  Page 6.  There's a quoted passage from a

8  chat that was separately offered as an exhibit to today's

9  hearing.  And it says, you don't do stocks no more.  Answer,

10  presumably from the defendant is what they're proffering, no.

11  Never did.  I just tell people that.

12      And so the government was trying to say that he's

13  kind of admitted in the chat that he's not always been

14  forthcoming about his financial dealings.  And so I wanted to

15  give you a chance to react to that, and to the Florida

16  driver's license issue that they raised.  Oh.  And to

17  ownership of property in Trinidad.  So three things I want you

18  to respond to.

19      MR. EDELMAN:  I'll start with the last, Your Honor.

20  It's the easiest.  That property is addressed in the

21  defendant's memorandum.  That is a property that his family

22  currently occupies.  He did help build an additional property,

23  but that picture is in there, pictures of a residence where

24  his cousins and/or other family members are living.

25      THE COURT:  His sisters and his cousins and his

1     aunts, as Gilbert and Sullivan would have said.

2           But he bought it, he's the owner?

3           MR. EDELMAN: He's a partial owner of the property.

4           THE COURT: Okay. So it's another one of these

5     things that you're contending would have been disclosed maybe

6     if counsel had been present. You don't want the nondisclosure

7     of that to be held against him.

8           MR. EDELMAN: That's correct, Your Honor. And it

9     wouldn't make sense. This is an example just on its face.

10     There's no mystery that Mr. Hamilton had been back and forth

11     to Trinidad and Tobago. He has family there, he has -- he's a

12     dual citizen of that country. So he's not trying to hide the

13     fact that he has ties there, including he helps his family

14     build the house that they live in. That's not -- doesn't go

15     to -- I don't think that adds anything to the government's

16     evidence in this case that there's no conditions that can be

17     fashioned.

18           THE COURT: Okay.

19           MR. EDELMAN: So that's the house, Your Honor.

20           As to the --

21           THE COURT: Driver's license and the chat.

22           MR. EDELMAN: The driver's license, there's just no

23     evidence. They say that they have a license that did not

24     check out. The government believes the picture matches his.

25     Are you talking about the -- the government has referenced two

1   driver's licenses.  I believe the government said there's a

2   valid Florida driver's license, and there's one under a

3   different name that appears to not be valid.

4          THE COURT:  Right.

5          MR. EDELMAN:  There's no evidence he's ever used it.

6   So I just don't -- that's fine, but I think there's a document

7   that has his picture on it, but if he's never used it, and

8   there's no way he could use it, the government has never

9   argued that that license could successfully, or one like it,

10  enable him to flee the country, while he's under Pretrial

11  Services supervision.  I don't think it adds almost anything

12  to the evidence that he is -- that no conditions can be

13  fashioned.

14         THE COURT:  Okay.  What else?

15         MR. EDELMAN:  The third, the chat, I think we just

16  have to read the words, Your Honor.  It doesn't -- I think the

17  government is suggesting that Mr. Hamilton's statement to

18  anybody that he never traded digital currency was always

19  false.  He doesn't address trading digital currency.  It says

20  you don't do the stocks.  Stocks are not digital currency.  I

21  don't mean to be glib, Your Honor.  They're just two very

22  different things.  So he's not claiming that he never -- I

23  don't think we made any representations that Mr. Hamilton ever

24  did trade any stocks.  So I just don't think this exchange

25  shows that he's admitted to something --

1          THE COURT:  Okay.

2          MR. EDELMAN:  -- or that his statements that he's

3    traded digital currency are false.

4          THE COURT:  Okay.  Obviously, there's a few other

5    things that the government has mentioned, including crypto

6    transactions where I think the government's point was it

7    doesn't really matter what the dollar value of those may have

8    been, as much as it is these are kind of extensive crypto

9    transactions, which cause the government or should cause the

10   Court concern that he's someone who, again, is of the level of

11   sophistication and ability to trade in currencies heighten his

12   flight risk.

13         You know, why don't we see if Ms. Wells wants to talk

14   about that, and then you can have a chance to respond to that,

15   too, because we haven't let Ms. Wells talk hardly at all.

16         Are you okay with that, Mr. Edelman?  Is there

17   anything else you want to add right now?

18         MR. EDELMAN:  Not right now, Your Honor.  Thank you.

19         THE COURT:  Okay.  Ms. Wells, you have the floor.

20         MS. WELLS:  Thank you, Your Honor.

21         When we first scheduled this hearing, or maybe one or

22   two appearances back, the Court asked the defense to file a

23   motion explaining what, if anything, had changed since the

24   appearance in Virginia.  And I think the concerns that you

25   raise today, Your Honor, are spot on because, frankly, nothing

1    has changed that makes it more likely that the defendant would

2    abide by the rules of a bond.  And, in fact, the evidence that

3    the government has obtained since then, as we've reviewed his

4    phone and gone further through the evidence recovered during

5    the search of his home, has made it quite clear that he has

6    significant foreign ties, that he has a serious incentive to

7    flee, that he has a demonstrated pattern of concealing his

8    assets and using falsified documents.

9         To begin just with the charged conduct, because this

10   does go to his ability to flee and not just to the weight of

11   the evidence.  He is charged with being involved in a

12   counterfeit currency conspiracy.  Necessarily that involves

13   falsified documents.  That conspiracy took place on AlphaBay,

14   which is a dark web -- was a dark web marketplace site.  There

15   have been a number of sites like AlphaBay over recent years,

16   and all of them, including AlphaBay, are designed with a

17   specific goal.  It is to make available illegal goods and

18   services otherwise --

19        THE COURT:  Interrupting you for a second.

20        I don't always believe that weight of the evidence is

21   the least important factor.  The case that was cited, I'm very

22   familiar with that case, can't remember the case name now, in

23   the defense motion.  I found that it can be important if the

24   offense conduct has a particularly tight relationship with

25   flight risk.  But I don't think that's the case here.

1    Certainly, it's a concerning kind of event if he were to be

2    guilty of conspiring to trade in cash, but I can envision many

3    defendants charged with that offense who based on their own

4    nature and circumstances, personal history, potentially could

5    be released so I'm not really persuaded by where you're going.

6         MS. WELLS:  Here, if I could just clarify the point

7    that I want to make about this.  This defendant has a

8    particular facility, with using this type of website.  Not any

9    person sitting in this courtroom or elsewhere knows how to get

10   on the dark web, find a site like AlphaBay, and then has the

11   wherewithal to transact in crypto currencies to purchase

12   illegal goods and services.  To Your Honor's point, he did not

13   fall off the turnip truck.  There's a certain level of

14   sophistication there, and a certain ease with which he can

15   move in those environments, and a very clear familiarity with

16   those environments that would enable him more than most

17   defendants to in the future get additional falsified

18   documents, which, by the way, he also has a pattern of having.

19        The driver's license that the government included,

20   I'll leave it to the Court to look at that picture and say

21   whether or not the Court believes that that's Raheim Hamilton.

22   But I would submit that it absolutely is.  There's a very

23   positive likeness there.  That driver's license on its face is

24   valid through 2025.

25        THE COURT:  Where was it found?

1          MS. WELLS:  In his home, Your Honor.

2          THE COURT:  Okay.  Is that where the hundred thousand

3     cash was found?

4          MS. WELLS:  The home -- yes, Your Honor.  The 100,000

5     in cash was found in the home.  The $200,000 in precious

6     metals was found in the home.  And to be clear, the $4 million

7     with crypto currency, that's a value as of the date of the

8     seizure.  Now, as the Court knows, that -- those amounts are

9     quite volatile, and a year ago that was worth quite a bit

10    more.  And so to the point that the government made --

11         THE COURT:  What's it worth now, five dollars?

12         MS. WELLS:  Today it's worth about $4 million.

13         THE COURT:  Oh, okay.

14         MS. WELLS:  It was seized just a few weeks ago.

15         THE COURT:  Okay.  Because I --

16         MS. WELLS:  So there hasn't been that kind of

17    fluctuation in the --

18         THE COURT:  Yeah.  I don't really care that much

19    about the crypto currency in terms of value, as much as I care

20    about the facility issue, the turnip truck issue, which, to

21    me, more bears upon the lack of disclosure than anything else.

22    But he indicated that the government -- well, let me put it

23    this way.

24         What can the government proffer, other than that the

25    currency and the precious metals were found in the defendant's

1    home, what else could the government proffer, linking that to

2    him?  Because there was certainly a suggestion today that it's

3    not mine, may not have been his.

4         MS. WELLS:  Your Honor, there is in the messaging

5    content that we have from the defendant's phone just a

6    significant amount of correspondence with individuals in

7    Mr. Hamilton's family and with a particular individual located

8    in Trinidad where the defendant has a habit of sending or

9    using services, they're crypto for cash exchange services

10   where -- you have to make crypto liquid, if you have it, and

11   it can be challenging to do that.

12        One way that it's done that could be legitimate but

13   often is not is that people use these crypto for cash

14   services.  And he would send crypto currency to different

15   people, but including this one individual in Trinidad, and

16   received cash by mail.  There are a number of those packages

17   that the defendant has sent to his family members, including

18   his mother over the years.  We have quite a bit of evidence

19   that he sent packages like that to recipients in Trinidad,

20   including himself.  So he has a demonstrated pattern of

21   cashing out that crypto currency, converting it into cash.  I

22   think there's a message that the government included in the

23   memo that we filed yesterday, where he discusses with that

24   individual in Trinidad trying to purchase precious metals in

25   Trinidad, trying to purchase fine art in Trinidad, other means

1  that people can use to cash out that crypto currency, and in

2  the government's view, launder it into other assets that

3  appear to be legitimate.  And as for the crypto currency

4  itself, I think something that's sort of critical in

5  understanding this, the way that those seizures can take place

6  requires access to, essentially, a key or a seed phrase.  A

7  number of those seed phrases, which is sort of like finding a

8  combination of your bank account number and your pin written

9  down in a single place.  A number of those seed phrases were

10  recovered in the defendant's home.  That's how the government

11  was able to recover that crypto currency.  We can't just reach

12  out into the Internet and grab anybody's crypto currency.  We

13  need that information.

14        The information and the only information that would

15  have allowed the government to seize that was found in his

16  home.  We can't just go out and -- it's why we make the point,

17  Your Honor, that if you do the math, based on just the

18  proceeds from AlphaBay, and, again, and I hear your point that

19  the value of that today may not be the most critical, but if

20  you just do the math, that's worth about $9 million today.

21  What the government has recovered is not $9 million.  That

22  suggested there could be a significant amount of money left

23  out there on the Internet where we cannot reach it, and has

24  not been disclosed.  But the arithmetic, which isn't

25  complicated, suggests that he has a lot more money that he has

1   not told anybody about.  And that again, to your point,

2   Your Honor, goes to the ability that he has to flee.  And so

3   that pattern of using these false documents and not disclosing

4   these identification documents, you've got a fake Florida ID,

5   there is the bank card that was recovered, a photo of that

6   bank card on his phone, the records related to that bank card

7   appear to relate to this defendant, IP addresses that go back

8   to his former home address, but current at the time of the use

9   of the bank card, and other information tying it to the

10  Suffolk, Virginia area where he was living, which suggests

11  that he has used a false document in the past, and again to

12  conceal assets through a fake name which is tied to a

13  different bank account.

14          I also wanted to add, Your Honor, going to just

15  Pretrial Services' recommendation, Pretrial, as this Court

16  knows, does a wonderful job of preparing its reports, but it

17  is limited in what it considers in making its recommendation,

18  and what it incorporates into its reports.  So not considered,

19  and, of course, Ms. Lesch can correct me if I'm wrong, but not

20  considered in that recommendation is any of this information

21  about what the defendant failed to disclose to Pretrial

22  Services.  Not considered in that report is any of the

23  information related to the false documents.  Not considered in

24  that report is anything related to the weight of the evidence.

25  Essentially, Pretrial can look up the criminal history of a

1   person, they collect the information that is reported by the

2   defendant themselves, but information that the government

3   proffers doesn't go into that calculus, and so --

4          THE COURT:  And criminal history was something of a

5   concern, wasn't it, because there was some type of suspended

6   sentence and probationary disposition that I think you

7   contended the defendant was still under at the time of the

8   charged conduct; is that right?

9          MS. WELLS:  That is correct.  There was a larceny

10  charging conviction, and at the time of the AlphaBay conduct

11  that's charged in our indictment, that was ongoing while he

12  was still under supervision for that previous conviction.

13         THE COURT:  Okay.  So quick question for Ms. Lesch.

14         Ms. Lesch, the Pretrial Services recommendation, is

15  the Court correct that that recommendation is based really on

16  the information that was provided to Pretrial Services Officer

17  Bell in the Eastern District of Virginia, and the report that

18  Bell prepared and nothing else?  Or was there something else

19  that you did rely on?

20         THE PRETRIAL SERVICES OFFICER:  Your Honor, yes,

21  Your Honor.  We usually (inaudible) Pretrial Services report

22  (inaudible) in the other district, Your Honor, and what we do

23  here, we complete an addendum and attach that report.  We

24  also -- in this case, Your Honor, I did re-interview his

25  sister to -- proposed as a third party custodian, Your Honor,

1    and that's the only information.  I did get information from

2    the government regarding the alleged (inaudible), but that's

3    nothing that we consider in our case.

4           THE COURT:  Okay.  So I think -- I take it then the

5    answer to my question is basically yes, but then the other

6    question I was going to ask you, we're not really going to get

7    into the third party custodianship yet, we would do that if

8    it -- once we get to a decision on whether we're going to --

9    whether he's adequately re-opened the hearing, but did you --

10   I'm just curious, did you find out that the proposed third

11   party custodian got that job with the Isle of Wight sheriffs

12   department?

13          THE PRETRIAL SERVICES OFFICER:  Your Honor, what it

14   was --

15          THE COURT:  Here, I'll tell you, I want to have you

16   talk into a mike so that the recording picks you up.  Up here

17   is probably good.  Thank you.

18          The background is that in the other transcript in the

19   EDVA, she had said she'd been a police officer for Suffolk --

20   it just said Suffolk, but I was assuming that it was Suffolk,

21   Virginia, but was about to become employed hopefully by the

22   police in the Isle of Wight.

23          Did you find out whether that employment occurred,

24   whether she's now employed by the Isle of Wight police

25   department?

1      THE PRETRIAL SERVICES OFFICER:  Your Honor, from what

2  I gathered in my investigation and interview with the proposed

3  third party custodian, she mentioned that she was rehired at

4  Suffolk PD.

5      THE COURT:  Okay.

6      THE PRETRIAL SERVICES OFFICER:  However, two days

7  later she was advised to resign the position due to the

8  defendant's instant offense, and at the time that I

9  interviewed her, she was going for a job interview at another

10 location, Your Honor.  I believe it was a court in Virginia.

11     THE COURT:  Okay.  You've answered.  I was asking the

12 question, Counsel, because I happen to know that the Isle of

13 Wight is not off the coast of Virginia, it's not off the coast

14 of Wisconsin, it's in a foreign country.  But it looks like

15 that didn't come to fruition anyway.  So thank you, Ms. Lesch.

16     THE PRETRIAL SERVICES OFFICER:  Thank you,

17 Your Honor.

18     THE COURT:  Okay.  So, Ms. Wells, what else did you

19 want to tell me?  Go ahead.

20     MS. WELLS:  Only to emphasize, Your Honor, and the

21 Court is familiar with the papers, that the defendant's

22 foreign ties really are thorough.  The conversation is with

23 the girlfriend located in Vietnam date back until at least

24 2019.  And so -- and there is evidence that he has traveled

25 connecting through other countries, absolutely, but evidence

1    that he has traveled there and spent significant time there.

2    His families connections to Trinidad are thorough and probably

3    more thorough than they are to Virginia.  He was born in

4    Trinidad, his parents were born in Trinidad, they obviously

5    spend quite a bit of time there.  His messaging conversations

6    show very close family ties in Trinidad, also in the United

7    Kingdom.  It's just one -- oh, I'm sorry.

8              THE COURT:  No, I didn't mean to interrupt you, but I

9    just want you to come more directly at the movant's point

10   here, which is the fact that he has family and friends and

11   ties in Trinidad, the fact that he has a girlfriend in Vietnam

12   shouldn't be held against him.  Sometimes people have friends

13   and family and girlfriend overseas, and that doesn't mean

14   they're going to run.  Although I said, in the Court's

15   experience, if you have a place to go to in a foreign

16   jurisdiction, you have the money to get yourself, it can be a

17   concern.  But I want to give you a chance to address that.

18   Why is that extraordinary?

19             MS. WELLS:  I don't know if it's extraordinary,

20   Your Honor, but I think what is material here is that these

21   were not -- certainly the UK ties and the Vietnamese ties were

22   not disclosed.  The Trinidadian ties were minimized.  The fact

23   that there is property ownership, whether it's partial or not,

24   was not disclosed.

25             So there's a home to go to.  There's messaging

content that suggests the defendant may also have purchased a
second lot or property for development of the townhouses in
Trinidad.  I cannot point to an address for that, but there's
a suggestion of that.  There's at least one message.  He
discussed with his girlfriend in Vietnam sending her money so
that she could buy property in Vietnam, he discussed with
cousins or friends or contacts in the United Kingdom the idea
of purchasing property there as well.  And none of this was
raised with Pretrial Services.  This is all being proffered by
the government after reviewing the defendant's phone.

So I think what makes this, perhaps you're right,
Your Honor, is extraordinary is the level of concealment.
Because if you have contacts abroad, although foreign ties are
relevant to detention consideration, that is a little bit
different than concealing that information, having a
demonstrated history of using false documentation, hiding your
property ownership.  And, frankly, Your Honor, the assets at
issue here, you know, there's a claim that the defendant was
an early adopter of the crypto currency.  But what was
reported to Pretrial is a five-month work history at a home
improvement store.  That does not buy someone nearly a million
dollars worth of US based real estate.  It doesn't.

THE COURT:  We're back to the turnip truck.

MS. WELLS:  There's no explanation for this.

THE COURT:  We're back to the turnip truck because he

1    says he wasn't represented at the time, and, you know,

2    shouldn't be held against him what he told Officer Bell in the

3    EDVA response.

4            MS. WELLS:  He may not have had counsel with him, but

5    he was represented by counsel.  As far as I recall, I was

6    having conversations with attorneys related to this matter,

7    very shortly after his arrest.

8            THE COURT:  He was represented at the hearing.  The

9    hearing occurred after the pretrial interview, right?

10           MS. WELLS:  And I don't know that this is material

11   for the Court to consider.  I'm saying I had spoken with his

12   attorney before the hearing.

13           THE COURT:  It's material if the attorney could have

14   corrected things at the hearing and did not.

15           MS. WELLS:  That is the point, Your Honor.  And so my

16   point is only his attorney was not -- did not appear for the

17   very first time on the case and did not have this first

18   conversation about the matter in that hearing.

19           THE COURT:  It sounds --

20           MS. WELLS:  I can't really say more than that.

21           THE COURT:  Yeah.  And I'm not going to make a

22   finding on this, I don't think, but it sounds, from what the

23   defense is saying, that things were moving really fast down

24   there, and that the full gravity of the government's position

25   wasn't really apprehended by the defense here.  Sounds like

1   that's what he's saying.  And I don't know where that gets us

2   today because I have to look at 3142(f), and how much of this

3   was known to him before.  And I still haven't really heard

4   much that is new, that could -- I haven't heard much that

5   wasn't known to him before.

6          MS. WELLS:  Your Honor, I agree with that.  I think

7   all of this information was known to the defendant, and, in

8   particular, his assets were known to the defendant.  I don't

9   think there can be much confusion in the interview that you

10  have $4 million of anything lying around, or $200,000 worth of

11  precious metals.  That's not something a person forgets.

12         THE COURT:  Yeah.

13         MS. WELLS:  And certainly not a defendant with the

14  level of sophistication of this defendant.

15         THE COURT:  Okay.  Final point on weight, I think, is

16  that there's a grand jury indictment in the case, so there's a

17  finding of probable cause as to the charged offense, for

18  whatever that's worth.  That's more weight than maybe you'd

19  find if it were just a complaint case.

20         We want to let Mr. Edelman respond.  Do you have

21  anything else?

22         MS. WELLS:  Yes, Your Honor.  I'd like to -- I do

23  certainly want Mr. Edelman to respond.  And I want to note

24  that it is the government's view that we have put forth

25  sufficient evidence for the detention order to remain in

1 place. And after Mr. Edelman gets the final word, I think I

2 would ask the Court to let the government know, if there's an

3 agreement there.

4       If not, there is additional information that I could

5 proffer today that suggested in the filing that we made

6 yesterday that relates to currently uncharged conduct that we

7 believe bears on his flight risk, but if it's not necessary to

8 reach that, Your Honor, I would prefer not to, and I

9 understand --

10       THE COURT: Yeah. That always puts me in a funny

11 position, right? Because, I mean, I'll tell you, as I was

12 about to tell Mr. Edelman, that because the burden -- you

13 haven't addressed that very much. Your burden to establish

14 detention is very low. It's preponderance of the evidence.

15 And if we consider the detention question anew, I mean, that's

16 where I'm leaning, that you've met that. Whether you want to

17 put more in at this point is totally up to you.

18       I don't want to do anything that might be perceived

19 as the Court giving you cover to not have to put something

20 forward that you don't want to. If somebody later says that

21 you should have put it forth today, they'll say that, and

22 anything I say or do doesn't affect that.

23       But is there anything else you want to add?

24       MS. WELLS: At the moment, no, Your Honor.

25       THE COURT: Okay. So, Mr. Edelman, tell me what your

1   response is to this.  And, again, I've kind of let on to you

2   that I'm leaning in a couple directions.

3         The first is, I just don't think there's enough to

4   re-open this hearing that is not known to the defendant at the

5   time, and if its nonpresentation was a function of how that

6   hearing was done, I think we've at least given you an

7   opportunity today to re-argue many of those things.  And the

8   second point was, I'm having a hard time finding that they

9   didn't meet their burden by a preponderance on the

10  nonappearance risk.  And I'm not going to go over everything

11  why, but access to funds, important.  Access to foreign

12  locations, important.  I'm not really swayed by the idea that

13  one cannot travel without a US passport.  If there's

14  substantial assets that that person possesses, I think there

15  are ways to get there, in my humble opinion.

16        So place to go, money to get there.  Places, plural,

17  to go.  And the nondisclosure is a concern because I do view

18  your client as a sophisticated and knowledgeable person who

19  should have known if he's asked to disclose assets, that he

20  needed to disclose those assets.  If that included partial

21  ownership in a home in Trinidad, that's what that included.

22        He certainly knew that things had been seized from

23  his residence.  He certainly, if he didn't know they were

24  seized, he'd know there were cash and precious metals there.

25  Somebody should have said, you know, that stuff's not mine.

1           He's never really said that.  He said that it hasn't

2  been firmly enough established that it is.  But based on the

3  proffer, his home, probable cause to think that he was

4  involved in a conspiracy concerning US cash, right, conspiracy

5  to sell counterfeit cash, and chats and discussions and

6  activities with this crypto individual where crypto gets

7  converted to cash, there's plenty there for the Court to find

8  by a preponderance that that is a factor that is weighing

9  against him on detention.

10          So I'm doing too much of the talking.  You go ahead

11  and respond to anything you want.  But I want to clue you in

12  to where I'm at.

13          MR. EDELMAN:  Thank you for that opportunity,

14  Your Honor.  There's -- I'm going to go in reverse order as

15  far as whether the government met its burden for the

16  preponderance.

17          So, first, there's a lot of emphasis by the

18  government, and Your Honor as well, behind the idea that

19  Mr. Hamilton is very sophisticated and that he has a facility.

20  I think what matters is whether it's a facility to flee.  I

21  understand Your Honor's comments.  I don't think the

22  government has really connected the dots, if it's true that

23  he's really good at the dark web, that somehow that enables

24  him to travel undetected without valid documents.  I think

25  that's what they have to show, and they just haven't done it,

1    (inaudible) very good at this.

2            THE COURT:  Yeah.  I was more persuaded by ability to

3    fund getting there and a place to go than I was about the dark

4    web.  I barely know what the dark web is.  I understand the

5    allegation.

6            MR. EDELMAN:  As far as lack of disclosure, I

7    understand the Court's point.  I have been involved in these

8    interviews.  These questions are not always raised very well,

9    through no fault of anybody's.  That's why it helps to have a

10   lawyer present.  I'll just give you an example.  Somebody

11   could say, you know, Mr. Defendant, tell me about your assets,

12   you know, bank accounts, cash, that kind of thing.  They'll

13   just add things, and somebody -- okay, I'll (inaudible)

14   counsel --

15           THE COURT:  Kind of an elephant in the room, though,

16   don't you think?  The precious metals, the cash?  Wouldn't it

17   be an elephant in the room?

18           MR. EDELMAN:  Well, I think it's the opposite on some

19   level, if, in fact, Mr. Hamilton was aware that the government

20   had raided his home and seized it, a lot of lay people without

21   counsel present think those are not my assets.  Again, I don't

22   know how it's phrased.

23           THE COURT:  Okay.

24           MR. EDELMAN:  I don't know if they're asking what he

25   has access to now that he's in jail.  They have very

1    interesting thoughts about what they --

2              THE COURT:  They do.  Go ahead.

3              MR. EDELMAN:  So as to the lack of disclosure, I will

4    say Pretrial Services, I do believe, I don't know Ms. Lesch's

5    answer as to whether she reviewed the transcript, I know that

6    she was provided the transcript by the government from

7    Virginia.  So to the extent she did review it, Pretrial

8    Services actually has looked at all these arguments about lack

9    of disclosure, false documents, and so forth, and their

10   recommendation's the same.  However, if there's a premise

11   there, what I don't know the answer to is whether her view of

12   the transcript is part of the recommendation.

13             I'll say, you know, there was concern about the

14   probation that was a misdemeanor, larceny conviction that

15   Mr. Hamilton was on supervised probation at the time.  So I

16   just think it's apples to oranges in terms of, well, if

17   somebody were to do something illegal while they're on

18   unsupervised misdemeanor probation, no conditions could be

19   fashioned in the federal system, whether you have a custodian

20   with more onerous conditions to assure their appearance.

21             THE COURT:  Yeah, it would be worse if there were a

22   whole bunch of failures to appear, or a whole bunch of

23   probation violations, but there's a concern, one of the

24   conditions of any probation is thou shall break no laws,

25   right, or thou shall not commit any crimes.  And there's

1  probable cause here by the grand jury to believe that this

2  offense was committed, even if we presume innocence at the

3  detention stage.

4        MR. EDELMAN:  Agreed.  Same.  I agree with the legal

5  standard that Your Honor set forth.

6        THE COURT:  Okay.

7        MR. EDELMAN:  Few more points, Your Honor, briefly.

8        Very quick research.  I do believe there's an Isle of

9  Wight, Virginia.  There may be another one out there.

10       THE COURT:  Oh.

11       MR. EDELMAN:  There's one in -- just around Suffolk.

12       THE COURT:  Okay.  It's immaterial.  But thank you.

13  Because if I erred in that respect, I would want to pull that

14  back.

15       MR. EDELMAN:  Well, just clarify, that it is a little

16  concerning this issue of reverse custodian whose police

17  employment when she was re-hired, the rug was pulled out from

18  under her.  I understand there's some information that federal

19  law enforcement reached out to the police department and

20  suggested that maybe she shouldn't be employed anymore.  I

21  have no idea if those people were in Virginia or here.  I'm

22  not impugning the motives of anybody, but to the extent it

23  made Mr. Hamilton's job of trying to secure the pretrial

24  release, which he's entitled to do harder, that's problematic.

25       THE COURT:  But you don't know that anybody did that.

1          MR. EDELMAN:  I wouldn't proffer something I

2  didn't --

3          THE COURT:  Yeah.

4          MR. EDELMAN:  Some information, I believe somebody

5  represented that, yes, the federal agents that reached out.  I

6  don't know who they were with, I --

7          THE COURT:  All right.

8          MR. EDELMAN:  -- (inaudible) in this room.

9          THE COURT:  Well, Suffolk PD made the decision it

10  made, and whether that's a right or a wrong decision, that's

11  not really before the Court today.

12          MR. EDELMAN:  I understand, Your Honor.

13          And the last is, I just don't understand the basic

14  argument of Mr. Hamilton might flee to Trinidad and Tobago.

15  There's an extradition treaty.  It would be -- it just makes

16  no sense that he would do that.

17          THE COURT:  Well, I can tell you about that.  If

18  there's an extradition treaty, that doesn't mean it is easy to

19  get the person back.  You have to file an extradition request,

20  you have to meet the terms of the treaty, it has to go through

21  the Office of International Affairs, it has to go through the

22  country, they have to decide in their Justice Ministry, are we

23  going to send this person back or not.  There's a right in

24  most countries to oppose extradition.  It's not this kind of

25  matter that you'd find if you found somebody having fled to

1    the Wisconsin Dells, and the Wisconsin State Police picked the

2    person up at the Kalahari Resort and bring them -- it's a

3    totally different thing.  So I'll tell you, that's my

4    perspective on that.

5           MR. EDELMAN:  I appreciate that, Your Honor.  I will

6    just note that the agencies involved in this and the people on

7    the government side are the folks who make those kinds of

8    requests and successfully do so all the time.

9           THE COURT:  But there would be -- it doesn't give me

10   assurance on flight risk that we can get him back through

11   extradition treaty.  It just doesn't give me comfort.  I am

12   just telling you that.

13          Anything else you want to add?

14          MR. EDELMAN:  Unless Your Honor has any other

15   specific concerns, just one moment, please.

16          THE COURT:  Yeah.

17     (Short pause.)

18          MR. EDELMAN:  I think one final fact, Your Honor, the

19   government proffered some facts about transactions, cash for

20   digital currency transactions.  Whether or not Mr. Hamilton

21   was involved in that, the proffer would be that the other

22   person listed on the side of that is an attorney in Trinidad.

23          THE COURT:  Uh-huh.

24          MR. EDELMAN:  So I think it'd be problematic to

25   rest -- there's a lot of thorny issues surrounding whether his

1   communications with that person are privileged, is something

2   that should be used to advance his detention here.  And

3   regardless of the privilege issue, I just think there's an

4   attorney.  There's an attorney, and it tends to undercut this

5   idea of involvement (inaudible) to conceal transactions that

6   give him a higher flight risk.

7            THE COURT:  All right.  So here's what we're going to

8   do.  I'm going to deny the motion for release, document 37.

9   I'm going to construe it as a motion to reopen the detention

10  hearing under 3142(f), and I'm going to find that there has

11  not been presented any information that is material that was

12  not previously known to the defendant or knowable, but I'll

13  add that even had we reopened the hearing, because I think for

14  practical purposes, we did today because I wanted Mr. Hamilton

15  to be fully heard and the government to be fully heard, I

16  don't think a basis has been presented to me to find that the

17  government couldn't or didn't meet its preponderance burden.

18  Not clear and convincing evidence.  That's what we have under

19  community safety.  It's preponderance.  For the record, I am

20  holding my hands together with one hand, just a little bit

21  above the other, because it's a light burden, right.  It's a

22  light burden.

23            And my basis for that is proffered evidence of access

24  to significant amounts of funds, possibly even to an unknown

25  amount, but certainly significant amounts of funds, and places

1   to go where there are significant ties in foreign countries.

2   The strong family ties in Trinidad.  It's good that he has

3   relatives in Trinidad, but in the detention context it is a

4   concern that there are significant foreign ties because it's a

5   place someone could go, and then Vietnam as well, another

6   place someone could go.

7          Finally, I was persuaded by what I am perceiving as a

8   lack of a real fulsome disclosure to Officer Bell in the

9   Eastern District of Virginia by the defendant, and then

10   afterward by counsel, who, you know, for whatever reason,

11   these things didn't get disclosed, they were significant.  And

12   so, you know, that's a concern, that assets were not

13   disclosed.

14         I don't know about travel not disclosed.  I don't

15   know that I would necessarily go that far.  Because enough was

16   disclosed for there to be a concern that would rise to the

17   level of the government meeting its preponderance burden

18   without more.

19         So for those stated reasons we'll enter a further

20   detention order.

21         I have a question, Ms. Wells.  Did the EDVA court,

22   did they enter a detention order on their docket?

23         MS. WELLS:  I believe so, Your Honor.  But I would

24   want to double-check that before I stated it.

25         THE COURT:  Okay.  Before I enter my order, I would

1    like to see the written detention order that the Bail Reform

2    Act does normally require.  If you find any -- if you know

3    that it got entered, can you just enter it on our docket for

4    me, please?

5           MS. WELLS:  Yes, Your Honor.

6           THE COURT:  Okay.  And then you had some exhibits to

7    your motion, which were submitted to the Court.

8           So, Mr. Edelman, you received those, didn't you?

9           MR. EDELMAN:  Yes, Your Honor.

10          THE COURT:  Okay.  I considered those exhibits.  I

11    think they need to be of record.  Can you make sure they get

12    filed with whatever appropriate redactions are necessary under

13    the rule?

14          MS. WELLS:  Yes, Your Honor.

15          THE COURT:  Okay.  If you need a little time to do

16    that, that's okay.

17          MS. WELLS:  Thank you.  I appreciate that.

18          THE COURT:  Okay.  So just reasonable time.

19          That's it.

20          Remanded.  The defendant is remanded to the custody

21    of the Marshal Service until further order of court.

22          Finally, just we'll add that I want to thank counsel

23    today, all counsel.  And specifically I'll mention,

24    Mr. Edelman, Mr. Edelman, you have really an uphill climb with

25    this.  You really did based on the dye that was cast in the

1    Eastern District of Virginia.  And I thought you really did

2    your level best to make a game of this and to establish these

3    issues could even be revisited, and if they were, how would

4    they come out.  I thought your argument was really thorough,

5    well thought through, and you didn't agree with a lot of it,

6    but I thought you really did a great job fighting for your

7    client.  I just wanted to tell you that.

8           So we're adjourned, and thank you.

9           MS. WELLS:  Thank you, Your Honor.  Have a good day.

10          THE COURTROOM DEPUTY:  All rise.

11     (Proceedings concluded at 9:54 a.m.)

12

13

14

15
                       **<u>REPORTER'S CERTIFICATE</u>**

16          I, ANNETTE M. MONTALVO, certify that the foregoing is
     a correct transcript from the digital recording of proceedings
17   in the above-entitled matter to the best of my ability, given
     the limitations of using a digital-recording system.

18          Dated this 27th day of February, 2023.

19   /s/Annette M. Montalvo_____
     Annette M. Montalvo, CSR, RDR, CRR
20   Official Court Reporter

21

22

23

24

25